989 A.2d 282 (2010)
412 N.J. Super. 192
NEW JERSEY EDUCATION ASSOCIATION, Fred Aug, Jacqui Greadington, Martha Liebman, Diane Swaim, and Susan Wintermute, Plaintiffs-Appellants,
v.
STATE of New Jersey, John McCormac, former Treasurer of the State of New Jersey, Individually and Officially, Bradley Abelow, former Treasurer of the State of New Jersey, Individually and Officially, The New Jersey State Senate, as a body politic of the State of New Jersey, and the New Jersey State General Assembly, as a body politic of the State of New Jersey, Defendants-Respondents.
DOCKET NO. A-4460-07T1.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 2009.
Decided March 4, 2010.
*284 Kenneth I. Nowak, Newark, argued the cause for appellants (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; Mr. Nowak, on the brief).
Theodore VanItallie, argued the cause for respondents, State of New Jersey and the former Treasurers (Anne Milgram, Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Richard Evert, Deputy Attorney General, on the brief).
Leon J. Sokol, argued the cause for respondent, New Jersey Senate and New Jersey General Assembly (Sokol, Behot and Fiorenzo, attorneys, Hackensack; Mr. Sokol, of counsel; Steven Siegel, Kew Gardens, NY, on the brief).
Before Judges PARRILLO, LIHOTZ and ASHRAFI.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Plaintiffs, the New Jersey Education Association (NJEA) and certain of its active and retired members, brought this action to redress shortfalls in the State's statutorily-mandated contributions to the Teachers' Pension and Annuity Fund (TPAF) for fiscal years (FY)[1] 2004 through 2007. The Law Division ruled, as a matter of law, that the State was contractually obligated to plaintiffs for full funding of TPAF, but that, as a matter of fact, plaintiffs failed to show that the Legislature's funding gaps substantially impaired TPAF's ability to pay benefits for the next thirty years, so as to violate the Contract Clauses of the State and Federal constitutions. Accordingly, the Law Division dismissed the complaint, and plaintiffs now appeal. We affirm, finding that TPAF members, although entitled by law to the receipt of vested benefits upon retirement, possess no constitutionally-protected contract right to the particular level, manner or method of State funding provided in the statute.
Since its inception in 1919, TPAF has had the purpose of funding retirement benefits to public education workers. *285 Upon retirement, benefits paid are based upon the retiree's final average salary and total years of service, rather than upon contribution or return on investments. See N.J.S.A. 18A:66-44.
TPAF is governed by a statutory scheme enacted in 1967 known as the "Teachers' Pension and Annuity Fund Law." L. 1967, c. 271; N.J.S.A. 18A:66-1 to -93, -3 (hereinafter TPAF Act). TPAF subsumed prior state pension funds for education workers and subjected them to this statutory regime. N.J.S.A. 18A:66-3 to -93. TPAF is governed by a seven-member board of trustees, N.J.S.A. 18A:66-56, with the Attorney General serving as its "legal adviser." N.J.S.A. 18A:66-57. Its "technical advisor" is an actuary selected by a committee consisting of the Treasurer, directors of three Treasury divisions (Pensions and Benefits, Investment, and the Office of Management and Budget), and members of the boards of trustees of TPAF and the other State pension systems. N.J.S.A. 18A:66-57; N.J.S.A. 43:4B-1. The day-to-day administration of TPAF is carried out by the Division of Pensions and Benefits. N.J.S.A. 18A:66-57. As of June 30, 2006, the date of the most recent data available in this matter, TPAF had 140,831 active contributing members. In FY 2006, TPAF paid pensions totaling $2,075,424,405 to 62,212 service retirees; $57,324,718 to 2,447 disability retirees; and $78,099,815 to 3,955 beneficiaries and dependents.
TPAF is comprised of eight separate operating funds. N.J.S.A. 18A:66-16. Its funding comes from three sources: (1) contributions from employee wages; (2) contributions from the general revenue of the State; and (3) the return earned by these contributions when invested in the fund. N.J.S.A. 18A:66-18. As to the former, for FY 2004-2007, active TPAF members were required to contribute 5% of their compensation to TPAF.[2] The employee contribution rate may be reduced in the event TPAF has assets in excess of its liabilities. N.J.S.A. 18A:66-18(b).
The State's contributions, as employer, are credited to TPAF's main fundthe "contingent reserve" fund. N.J.S.A. 18A:66-18. The TPAF Act defines the amounts to be contributed and, as a basis for computing those amounts, mandates that they be determined annually, using the "tables [mortality, service, compensation or salary experience] recommended by the actuary which the board of trustees adopts," and the presumed "regular interest" rate of return on plan assets as set by the Treasurer. N.J.S.A. 18A:66-2(j), (i), -18.[3]
For purposes of determining the State's contribution to the pension fund, the actuary is required to use the actuarial value of assets rather than the market value. This method is designed to minimize the effect of market volatility. The actuarial value is defined as:
The value of the assets to be used in the computation of the contributions provided for under this section for valuation periods shall be the value of the assets for the preceding valuation period increased by the regular interest rate, plus the net cash flow for the valuation period (the difference between the benefits and expenses paid by the system and the contributions to the system) increased by one half of the regular interest rate, plus 20% of the difference between this expected value and the full *286 market value of the assets as of the end of the valuation period.
[N.J.S.A. 18A:66-18(b).][4]
There are three components to the State's annual statutory contribution: a "normal contribution"; an "accrued liability contribution"; and an "additional formula normal contribution" (AFNC). TPAF's actuary computes these three components on an annual basis. N.J.S.A. 18A:66-18.
The "normal contribution" or cost component represents the pension costs of the service rendered in a given valuation year by the active TPAF member, that is the pension benefits members will accrue due to their service during the upcoming fiscal year. N.J.S.A. 18A:66-18(a); L. 1994, c. 62, § 2. For the years in question, the normal contribution computed by the TPAF actuary grew from $448,664,518 in FY 2004 to $560,691,960 in FY 2007.
The "accrued liability contribution" is an amortization payment addressing TPAF's "unfunded accrued liability", which is the amount of "the accrued liability of the retirement system" that is not "already covered by the assets of the retirement system[.]" N.J.S.A. 18A:66-18(b). If such liability exists, the actuary calculates the "accrued liability contribution[s]" needed to amortize it over thirty years. Ibid. The accrued liability component of the State's statutory contribution began in FY 2004 as $35.8 million and grew to $500.7 million in FY 2007.
The final component of the State's statutory contributionAFNCrepresents the additional benefit cost of the improved pension benefit payable to TPAF members with the enactment of L. 2001, c. 133 (Chapter 133). In 2001, the TPAF retirement benefit was enhanced by reducing the divisor for a member's years of service from sixty to fifty-five. N.J.S.A. 18A:66-5.1, -35, -37, -44, -71; L. 2001, c. 133, § 4-7, 15. The State's liability for the benefit enhancement due to the change in formula, also known as the "additional formula normal cost[,]" would be payable out of the "benefit enhancement fund" (BEF) created for that purpose. N.J.S.A. 18A:66-16, -42.2. Each year, the excess valuation assets that remained after application to the normal contribution would be credited to the BEF, until it equaled the present value of the plan's total liability for the benefit enhancement. N.J.S.A. 18A:66-18(b), -42.2. The Legislature ensured at least the initial existence of excess valuation assets by declaring TPAF's valuation assets as of June 30, 1999, to be "the full market value of the assets as of that date," which was considerably higher than their actuarial value at that time. N.J.S.A. 18A:66-18(b). For any year when the BEF lacked sufficient assets to cover the benefit enhancement, the State would be obliged to contribute the difference. N.J.S.A. 18A:66-18, -42.2. In 2001, the excess valuation assets were $1.9959 billion; by 2004 they were depleted.[5]
The TPAF Act declares "the creation and maintenance of reserves" to pay benefits to be "obligations of the State." *287 N.J.S.A. 18A:66-33. It provides that the State "shall" make an annual contribution in accordance with the TPAF trustees' "itemized estimate of the amounts necessary." Ibid. The trustees, in reliance on the actuary's recommendations, must certify the contributions, "which shall be made by the State to the contingent reserve fund." N.J.S.A. 18A:66-58(b). Then, "[t]he Legislature shall make an appropriation sufficient to provide for the obligations of the State," N.J.S.A. 18A:66-33, and that the aggregate certified amount "shall" be paid into TPAF's main fund. N.J.S.A. 18A:66-18(d).
The general statutes that apply to TPAF and the other state pension systems similarly provide that the State "shall" make contributions for the current year's obligations, plus an "accrued liability contribution" to amortize the unfunded accrued obligation from prior years, if any, over a period of thirty years. N.J.S.A. 43:3C-9.5(c).
The general statutes recognize that vested members have "a non-forfeitable right to receive benefits," which they define as "mean[ing] that the benefits program, for any employee for whom the right has attached, cannot be reduced." N.J.S.A. 43:3C-9.5(a), (b). However, they also reserve the State's right to alter the "retirement systems and funds," and they deny that members have rights in the pension funds themselves:
Except as expressly provided herein and only to the extent so expressly provided, nothing in this act shall be deemed to (1) limit the right of the State to alter, modify or amend such retirement systems and funds, or (2) create in any member a right in the corpus or management of a retirement system or pension fund.
[N.J.S.A. 43:3C-9.5(e).]
In 1994, in the course of making modifications for all state pension plans concerning the procedures for valuing their assets and estimating the State's obligations, see L. 1994, c. 62, § 2, the Legislature made certain pronouncements about the management of a pension system:
In order to ensure the continued State funding of the public pension systems at levels related to the fiscal and financial soundness of those systems and in order to ensure the fiscal and financial integrity of the public pension systems, the Legislature finds and declares that:
a. public pension assets must be managed and administered to maintain their value and ensure appropriate levels of return on investment;
b. the accumulated assets of the public pension systems and their economic enhancement exist for the benefit of the retirees and members of those systems;
c. the statutorily-established benefits to which they are entitled belong to said retirees; and
d. no present or future retirees of [TPAF and the other state retirement systems] shall receive any reduction in benefits as a result of the provisions of this act, [P.L. 1994, c. 62.]
[L. 1994, c. 62, § 1.]
Despite these statutory admonitions, in FY 2004 and 2005, the Legislature made no TPAF appropriation, and in FY 2006 and 2007, appropriated monies to the TPAF less than the full statutory contribution calculated by the TPAF actuary. According to plaintiffs, these shortfalls totaled $2.6 billion, inclusive of the reallocation *288 of BEF assets.[6] Consequently, in a series of amended complaints first filed on December 23, 2003, plaintiffs sought declaratory and other relief against the State, its former Treasurers, the New Jersey State Senate and General Assembly (collectively defendants), compelling the appropriation of $2.6 billion to remedy the TPAF funding gaps. Plaintiffs alleged the failure to fund TPAF in the amounts certified by the TPAF actuary violated the Contracts Clause (Count 1), Due Process Clauses (Count 3), and Unlawful Taking Clauses (Count 4) of the State and Federal constitutions; violated the Uniformity of Taxation Clause (Count 7) and the Debt Limitation Clause (Count 6) of the State constitution; violated the TPAF Act (Count 5) and other State pension statutes, N.J.S.A. 43:3C-9.1, as well as the Internal Revenue Code (Count 8); constituted a breach of trust and fiduciary duty (Count 2); and was barred by the doctrine of promissory estoppel (Count 9).
On defendants' Rule 4:6-2(e) motion, the Law Division, in a detailed opinion of July 15, 2004 and order of August 10, 2004, dismissed Counts 7, 8 and 9; merged Counts 2 through 5 with Count 1; and denied dismissal of the constitutional Contracts Clause claim, ruling that plaintiffs have a contractual right to "systematic" funding of TPAF and therefore to the soundness and integrity of that public pension system, protected from substantial impairment by the Contracts Clauses of the State and federal constitutions. Defendants' subsequent motion to dismiss for want of subject matter jurisdiction was denied in its entirety. In its opinion of May 25, 2007, the Law Division found material issues of fact as to whether the State's contribution levels for FY 2004-2007 had substantially impaired the fiscal soundness and integrity of TPAF.
The matter then proceeded to a four-day bench trial featuring expert testimony on both sides on the appropriation shortfalls and their effects. Briefly, the record demonstrated no standard definition for the term "soundness and integrity," and that the Actuarial Standards Board, an authoritative standards-setting body, had not promulgated standards for assessing the soundness and integrity of a public pension system. However, the 1993 edition of Actuarial Standard of Practice No. 4 does set forth "generally accepted actuarial principles and practices" for "measuring pension obligations," and further indicated that, "funding methods," among other things, would be the subject of future standards of practice. Although this standard did not define the terms "integrity," "soundness," or "security," it noted that, "[i]n many cases, benefit security depends to a significant degree on the accumulation of sufficient plan assets." Significant for present purposes, the standard declared that funding decisions are the prerogative of the plan's sponsor rather than of the actuary:
The extent to which benefits of a plan should be funded in advance of the date when they must be paid is a decision to be made by the plan sponsor, with the assistance of the actuary, in light of many factors, including regulatory requirements, collective bargaining considerations and alternative uses of money.
In this regard, plaintiffs' expert, Vincent Amoroso, explained that the purposes of a pre-funded pension system like TPAF are to "provide asset security for the participants[,]" "smooth[ ] out" the employer's annual contributions, and promote "intergenerational equity" by ensuring that all salary and pension obligations to current workers were funded by the current generation of taxpayers. Despite the admitted *289 absence of any actuarial standards for achieving "intergenerational equity," Amoroso nonetheless opined an assessment of TPAF's "soundness" should not be limited to TPAF's ability to pay benefits for the next thirty years.
In the expert's view, TPAF's soundness had been substantially compromised by a growing unfunded accrued liability, compounded by the absence of earnings on the assets that should have been contributed by the State, but were not. He calculated that as of July 2006, if the shortfall were not restored, the lost earnings at the "regular interest" rate of 8.25% would total $8.5 billion in fifteen years, and $28 billion in thirty years, which is ninety-five percent of the market value of TPAF's assets at that time. According to Amoroso, the absence of those earnings requires that future generations make up the difference with higher taxes in order to maintain the statutorily required contributions. Nevertheless, the expert did not measure the effect of the FY 2004-2007 shortfalls on TPAF's capacity to pay retirement benefits over this thirty-year period. He also acknowledged that with the resumption of State funding of the normal cost and AFNC contributions, it was possible that TPAF could meet its obligations over the next thirty years if that unfunded accrued liability were "carr[ied] ... into perpetuity[.]"
Defendants' expert, Kenneth Kent, calculated the amount of the unfunded accrued liability at $2 billion, not $2.6 billion, because the use of BEF funds for the normal contribution was permissible. In any event, due to the remarkable 17.06% rate of return on TPAF's assets in 2007-8.81% higher than the 8.25% interest assumption set by the TreasurerTPAF's value, in market terms, grew by an extra $2.3 billion above its assumed growth, an amount virtually equivalent to the funding gap of FY 2004-2007. But even if the unfunded accrued liability had not been redressed by the 2007 investment returns, and was instead "carried" indefinitely from one year to the next, Kent's financial models showed that the funded ratio of TPAF assets versus obligations[7] would improve as long as appropriations equal to TPAF's annual obligations for benefits were resumed or phased in reasonably soon. The expert's models showed such results for the next thirty years, which he asserted as the longest period for reliable projection. Based on these assumptions, Kent concluded that the TPAF will continue to have enough assets to pay all retirement benefits for at least the next thirty years, despite the funding gap of FY 2004-2007. He also noted that the State had a wide range of options to effect future funding of TPAF, including but not limited to changes to employee contributions and retirement age.
After the close of evidence and extensive post-trial briefing, the Law Division issued an opinion on April 2, 2008, finding that plaintiffs failed to prove the FY 2004-2007 appropriation shortfalls substantially impaired TPAF's ability to meet its liabilities. The court reasoned in part:
On this record, the court agrees with defendants that plaintiffs have failed to establish a Contracts Clause claim. First, during the FY 2004-2007 the assets in the TPAF grew steadily. Second, *290 in FY 2007, the fund earned a return (17.06%) more than twice as high as that assumed by the actuary (8.25%). This resulted in the TPAF having an unanticipated influx of assets in a single year roughly equivalent to the State's FY 2004-2007 funding gap. Third, the evidence establishes there is no substantial impact on the long-term ability to pay benefits. In fact, Amoroso acknowledged the TPAF has sufficient funds to pay benefits over a period of thirty years. He testified, however, that the failure to fund the TPAF in the amounts required by the actuary will require future taxpayers to pay more than their fair share of contributions. He referred this failure to contribute [sic] as harming "intergenerational equity."
The court rejects this notion of intergenerational equity as the guiding principle in ruling on the merits. Simply put, on this record, there is insufficient evidence to warrant a determination that the soundness and integrity has been impaired by the State's funding decisions in FY 2004-2007.
On April 14, 2008, the court entered judgment dismissing the complaint in its entirety.[8] This appeal follows.
While we affirm the judgment dismissing plaintiffs' complaint, we do so for reasons other than those stated by the Law Division. See Ellison v. Evergreen Cemetery, 266 N.J.Super. 74, 78, 628 A.2d 793 (App.Div.1993) ("[A]n order or judgment will be affirmed on appeal if it is correct, even though the judge gave the wrong reasons for it"). In its July 15, 2004 opinion, the Law Division found that plaintiffs had contractual rights not only "to the receipt of their benefits," but also "to the soundness and integrity of the fund out of which those benefits are paid." Having declared a new, contract-based right to systematic funding of public pension systems, the Law Division then had to determine the effect thereon of appropriations shortfalls to ascertain whether the constitutional guarantee against impairment of contracts had been obligated. In our view, however, we need not decide whether there has been a substantial impairment because we find, as a threshold matter, no constitutionally protected contract right to the funding method adopted by the Legislature. Accordingly, the State is not contractually bound, in a constitutional sense, to pay the withheld appropriations to the TPAF.
The United States and New Jersey Constitutions both prohibit the impairment of contractual obligations:
No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts[.]
[U.S. Const. art I, § 10, cl. 1.]
The Legislature shall not pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made.
[N.J. Const. art. IV, § VII, ¶ 3.]
The two clauses "are applied coextensively and provide the same protection." In re Public Service Elec. & Gas Company's Rate Unbundling, 330 N.J.Super. 65, 92, 748 A.2d 1161 (App.Div.2000), aff'd o.b., 167 N.J. 377, 395, 771 A.2d 1163, cert. denied sub nom. Co-Steel Raritan v. New Jersey Bd.of Pub. Util., 534 U.S. 813, 122 S.Ct. 37, 151 L.Ed.2d 11 (2001). Accord P.T. & L. Constr. Co. v. Comm'r, Dep't of Transp., 60 N.J. 308, 313, 288 A.2d 574 (1972) (the two clauses provide "parallel guarantees").
*291 The clauses protect against a change in the State's obligations that "operate[s] as a substantial impairment of a contractual relationship." Allied Structural Steel v. Spannaus, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727, 736 (1978). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Gen. Motors Corp. v. Romein, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328, 337 (1992).[9]
Here, the essential threshold issue of whether there is a contractual relationship involves construction of the statutory scheme establishing public pension benefits for education workers. Statutory interpretation is a question of law for the court, subject to independent review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995); New Jersey Mfrs. Ins. Co. v. Horizon Blue Cross Blue Shield of New Jersey, 403 N.J.Super. 518, 523-24, 959 A.2d 858 (App.Div.2008).[10] As such, the reviewing tribunal owes no deference to a trial court's interpretation of the statutory language, or to its assessment of "the legal consequences that flow from established facts." Manalapan Realty, L.P., supra, 140 N.J. at 378, 658 A.2d 1230.
Under well-settled rules of construction, a statute will not be presumed to create private, vested contractual rights, unless the intent to do so is clearly stated. National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432, 446 (1985) (internal citations omitted). See also Dodge v. Board of Educ., 302 U.S. 74, 78-79, 58 S.Ct. 98, 100, 82 L.Ed. 57, 61-62 (1937). This is because the effect of such authorization is to surrender the fundamental legislative prerogative of statutory revision and amendment, Flemming v. Nestor, 363 U.S. 603, 610-11, 80 S.Ct. 1367, 1372-73, 4 L.Ed.2d 1435, 1444 (1960), and to restrict the legislative authority of succeeding legislatures. Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 110, 58 S.Ct. 443, 450, 82 L.Ed. 685, 696 (1938) (Black, J., dissenting).
[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise. This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Policies, *292 unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body.
[National R.R. Passenger Corp., supra, 470 U.S. at 465-66, 105 S.Ct. at 1451, 84 L.Ed.2d at 446 (internal citations and quotations omitted).]
Thus, while "[t]he responsibility for creating public contracts is the Legislature's[,][a] commitment of that kind should be so plainly expressed that one cannot doubt the individual legislator understood and intended it." Spina v. Consol. Police & Firemen's Pension Fund, 41 N.J. 391, 405, 197 A.2d 169 (1964).
In Spina, the Supreme Court rejected a contract characterization of New Jersey's mandatory public employee pensions, in part, because it would be "cumbersome" to impose on the Legislature all the implications of "one crisp word," id. at 402-04, 197 A.2d 169, and in part because the Legislature possesses the "needed power" to revise a public retirement plan. Id. at 404, 197 A.2d 169. In expressly rejecting the notion that the State has a contract-based obligation to "guarant[ee] ... the solvency of [public pension] fund[s]," id. at 403, 197 A.2d 169, the Court adopted a middle-ground approach, considering public pension programs as more than gratuitous but less than fully contractual, creating only property rights in the funds of the system. Id. at 402-03, 197 A.2d 169.
Because of the importance of this seminal case to the matter at hand, we examine Spina closely. Members of the pension plan at issue in Spina, which the Legislature had enacted in 1920, had been entitled under its original provisions to retire at age fifty after twenty years of service. Id. at 393, 197 A.2d 169. They contested the applicability of statutory amendments in 1944 and 1952 that only allowed retirement at age fifty-one after twenty-five years of service. Ibid. The Court noted that the 1920 legislation was a solution in itself, replacing a long history of unsound local pension schemes with one to which both municipalities and the State contributed. Id. at 393-96, 197 A.2d 169. Further, the significant reforms that had been enacted in 1944 and 1952, including the amendments at issue, were an attempt to finally "achieve actuarial solvency." Id. at 396-98, 197 A.2d 169. The Court addressed the question of "whether the amendments violated a constitutional right[,]" id. at 397, 197 A.2d 169, specifically plaintiffs' argument that "the amendatory legislation enlarging the requirements under the 1920 statute [was] constitutionally void as an impairment of a contract[.]" Id. at 393, 197 A.2d 169.
The plaintiffs in Spina claimed that a statutory mandate for municipalities to cover funding shortfalls demonstrated that the pension system was a "guaranteed fund." Id. at 399, 197 A.2d 169. The provision stated: "`In case there shall not be sufficient money in said pension fund created as aforesaid, the common council or other governing body shall include in any tax levy a sum sufficient to meet the requirements of said fund for the time being.'" Ibid. (internal citation omitted) (emphasis added).
The Spina Court observed that the Legislature had reserved the right to revise the pension system before it. Id. at 398, 197 A.2d 169. It then ruled that the Legislature did not intend to create a contractual obligation for the municipalities, or to relinquish its authority to revise their obligations itself. Id. at 399, 197 A.2d 169. Those rulings were in line with a previous ruling about the statutory requirement of contributions to amortize the pension system's *293 accumulated deficit. Ibid. See City of Passaic v. Consol. Police & Firemen's Pension Fund Comm'n, 18 N.J. 137, 147, 113 A.2d 22 (1955). The previous ruling was that the statutory requirement was not a guarantee of future funding equivalent to the creation of a State debt, "`but rather [the] present legislation merely provid[ed] that the State shall annually contribute to the fund.'" Spina, supra, 41 N.J. at 399, 197 A.2d 169 (quoting City of Passaic, supra, 18 N.J. at 147, 113 A.2d 22). The statutory requirement at issue in Spina, mandating coverage of current shortfalls, was likewise "simply an expression of legislative policy which remained within the control of that and every subsequent Legislature." Id. at 399, 197 A.2d 169.
Spina explained that "the general approach in our State" is that "the terms and conditions of public service in office or employment rest in legislative policy rather than contractual obligation." Id. at 400, 197 A.2d 169. Our courts thus determine "whether a statute tenders a contract or merely declares a state policy" by presuming the latter unless "the statute expressly calls for the execution of a written contract or confirms a settlement of a dispute." Ibid. Applying that test to the provision on which the plaintiffs relied, the Court held that "the 1920 statute did not result in a contract" because "[n]ot a word smacks of an intent to require or to permit one." Ibid. The Court further observed that attempts at the Constitutional Convention of 1947 "to introduce a contractual gloss in this area have failed." Ibid.[11]
The Spina Court found the statutory language did not amount to "a decision by the Legislature to part with its power of revision by thrusting a `contractual' obligation upon municipalities." Id. at 399, 197 A.2d 169. Although refusing to characterize the plaintiffs' interest a "contract" that had been impaired by subsequent legislative amendment, the Court noted the plaintiffs had some "property interest[,]" id. at 402, 197 A.2d 169, in their pensions under the 1920 statute, but expressly refused to define its precise nature: "We think there is no profit in dealing in labels such as `gratuity,' `compensation,' `contract,' and `vested rights.' None fits precisely, and it would be a mistake to choose one and be driven by that choice to some inevitable consequences." Id. at 401, 197 A.2d 169.
The Court then assessed the fit of the principles that it had set forth to the "usual situation" that inspires pension litigation, namely, "a fund that cannot meet all of the present and future demands upon it." Id. at 402, 197 A.2d 169. The Court noted that the question thus posed "is whether the Legislature is free to rewrite the formula for the good of all who have contributed." Ibid. It observed that even the states that had nominally embraced the contract theory and found a contractual obligation proceed to find that their state had nonetheless reserved the right to modify the pension system, which meant *294 there was no guarantee that the pension system would in fact pay the expected benefits. Id. at 402-04, 197 A.2d 169. Accordingly, the Court found that the reservation of a right to modify eliminated the mutuality of assent that is the essence of contracting, thereby proving the unsuitability of contract as an applicable rubric. Id. at 404, 197 A.2d 169.
Thus, the Court answered its question of whether the Legislature was "free to rewrite the formula for the good of all", id. at 402, 197 A.2d 169, by demonstrating that such freedom was recognized as necessary even in the states that nominally declared their pension systems to be contractual. Id. at 403-405, 197 A.2d 169. The Legislature's decision to amend the pension laws thus amounted to a "revision" for "the good of all who have contributed," a concept for which the Spina Court did not assay a definition or any parameters.
Spina did not address the precise question of whether the plaintiffs had a contractually enforceable interest in future contributions to ensure the ongoing fiscal integrity of the pension system in that case. Rather, the Court recognized only a property interest in the existing fund, which the State could not simply confiscate. While a number of our sister states since Spina have found the nature of the interest at stake more contractual, and extended it to future legislative appropriations, see e.g., Valdes v. Cory, 139 Cal. App.3d 773, 189 Cal.Rptr. 212, 222-23 (1983); Weaver v. Evans, 80 Wash.2d 461, 495 P.2d 639, 649-50 (1972); Dombrowski v. City of Philadelphia, 431 Pa. 199, 245 A.2d 238, 244-45 (1968), they have done do on the basis of either State constitutional provisions specifically providing that public pensions are contractual in nature, see, e.g., Alaska Const., art. XII, § 7 (defining public employee pensions as contractual obligations of the State); Haw. Const., art. XVI, § 2 (same); Ill. Const., art. XIII, § 5 (same); Mich. Const., art. IX, § 24 (same); N.Y. Const., art. V, § 7 (same), or statutory vesting language expressly stating that membership in the retirement plan establishes contractual rights and benefits. See, e.g., Mass. Gen. Laws Ann. ch. 32 § 25(5); Opinion of the Justices, 364 Mass. 847, 303 N.E.2d 320, 329 (1973); W. Va.Code § 5-10-32(a) (providing that the contribution amounts certified to the Governor by the PERS Trustees "shall be included in the appropriation bill to be submitted to the Legislature."); Dadisman v. Moore 181 W.Va. 779, 384 S.E.2d 816, 824 (1988); 71 Pa. Cons. Stat. Ann. § 5951; Dombrowski, supra, 245 A.2d at 244-45; former Cal. Gov't Code § 20757 (Stats. 1945, ch. 123 § 1) (providing that the monthly appropriation of employer contributions to the retirement fund are "continuing obligations of the State.")[12]; Valdes, supra, 189 Cal.Rptr. at 223. In Valdes, for instance, the court found an intent by California's legislature to be contractually bound, based on language in the prior statutes that pension contributions "`are hereby made and shall continue to be obligations of the State,'" and on the language in the then current statutes that those contributions were "`continuing obligations of the State.'" 189 Cal.Rptr. at 220 (quoting Stats. 1933, ch. 473, § 24 and former Cal. Gov't. Code § 20757).
Unlike these other States, New Jersey has no constitutional counterpart creating a contractual right to retirement benefits and likewise no statutory language that *295 clearly and unambiguously spells out a right to future legislative appropriations. On the contrary, as opposed to West Virginia, whose constitutional scheme prohibits its legislature from amending the state's general substantive statutes with budgetary language, Dadisman, supra, 384 S.E.2d at 825, New Jersey's constitutional Appropriations Clause, N.J. Const. Art. VIII, § 2, ¶ 2, and Debt Limitation Clause, N.J. Const. Art. VIII, § 2, ¶ 3, grant our Legislature sweeping and exclusive powers of appropriation and preclude one Legislature from binding future legislatures with respect to prospective appropriations. City of Camden v. Byrne, 82 N.J. 133, 151-54, 411 A.2d 462 (1980). See also New Jersey Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 13-14, 292 A.2d 545, app. dism. sub nom. Borough of E. Rutherford v. New Jersey Sports & Exposition Auth., 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972).
Eighteen years after Spina was decided, our Court, in the context of deciding the issue of public pension forfeiture, reaffirmed Spina's determination that traditional contract rights do not apply in the realm of public pensions. Uricoli v. Bd. of Tr., Police & Firemen's Ret. Sys., 91 N.J. 62, 71-72, 449 A.2d 1267 (1982). While the Law Division here correctly perceived a general evolution in pension fund jurisprudence toward an increased recognition of contract theory, its reliance on Uricoli as evidence of that trend in New Jersey seems misplaced. Contrary to supporting a robust and expansive application of contract law doctrine in New Jersey's public pension sphere, the Court stressed judicial deference to legislative intent in such matters. Id. at 77, 449 A.2d 1267. Recognizing "the vicissitudes of public policy and the shifting goals that are implicated in the pension laws," the Court emphasized that "pension entitlement is in the legislative domain and that the subject is one which can be most appropriately addressed by the Legislature itself." Id. at 78, 449 A.2d 1267.
We turn now to the TPAF statutory scheme presently in issue. N.J.S.A. 18A:66-1 to -93. As noted the State's obligation thereunder is to create and "maintain[]" reserves to pay benefits. N.J.S.A. 18A:66-33. To this end, the State "shall" make annual contributions in amounts certified by TPAF's actuary, ibid., which ultimately "shall" be paid into TPAF's main fund. N.J.S.A. 18A:66-18(d), -58. The general public pension statutes also provide that the State "shall" make an annual appropriation for the pension funds' current liability and for authorization of the unfunded accrued liability. N.J.S.A. 43:3C-9.5(c).
The Law Division in its July 2004 opinion, found these statutory references dispositive of a legislative intent to financially obligate the State to continually preserve not only TPAF's ability to pay current claims, but "the soundness of the system and the ability to make pension payments in the future." We disagree. The plain text of these statutes contains no enforceable right to any particular or systematic funding level or methodology in connection with TPAF.
Although use of the term "shall" is indicative of the strength of the Legislature's intent, we construe it as directory rather than mandatory since it relates to the form and manner in which the law is to be carried out and more clearly implements legislative intent. See State v. Jorn, 340 N.J.Super. 192, 196-97, 774 A.2d 507 (App. Div.2001); Franklin Estates v. Twp. of Edison, 142 N.J.Super. 179, 184, 361 A.2d 53 (App.Div.1976), aff'd, 73 N.J. 462, 375 A.2d 658 (1977). The statutory language, considered in full, does not clearly and unequivocally express an explicit enforceable *296 legislative commitment to a set level of future funding of TPAF's system. While TPAF's statutory scheme contains detailed mechanisms intended to improve the administrative efficiency and objectivity of the determination of the necessary contributions, the goal of actuarial soundness was also a feature of the legislation considered in Spina.
In our view, the concept of actuarial soundness does not appear to be a special characteristic reserved for projects with enforceable lifetime funding commitments, but rather an inherent and expected feature of any financing device that is intended to operate beyond the initial infusion of funds. Indeed, statutory language in N.J.S.A. 43:3C-9.5(c) to the effect "[t]he State shall make annual [contributions]... pursuant to standard actuarial practices" has been consistently present in our pension statutes for decades. See, e.g., City of Passaic, supra, 18 N.J. at 144, 113 A.2d 22. By the same token, it is far from clear that "the individual legislator," who knew from Spina that embracing the concept of actuarial soundness did not create a contractual obligation, would have "understood and intended" the singular reference in N.J.S.A. 18A:66-33 to the "maintenance of reserves" as creating one. Spina, supra, 41 N.J. at 405, 197 A.2d 169.[13]
Nothing suggests that the Legislature intended to bind the hands of future legislatures in such a substantial way or to relinquish its sovereign power to deal with changing fiscal conditions. Of course, absent specific legislative permission, a governing body cannot divest its successors of legislative power. City of Ocean City v. Somerville, 403 N.J.Super. 345, 359, 958 A.2d 465 (App.Div.2008); Maese v. Snowden, 148 N.J.Super. 7, 13, 371 A.2d 802 (App.Div.1977); McCrink v. Town of West Orange, 85 N.J.Super. 86, 91, 204 A.2d 10 (App.Div.1964). Here, there is no such legislative authorization. To the contrary, the Legislature plainly and clearly reserved to itself the right to "alter [or] modify" TPAF, N.J.S.A. 43:3C:9-5(e), just as Spina described for the pension scheme before it. 41 N.J. at 403-05, 197 A.2d 169. That the Legislature retained for itself the power of revision is contrary to any intent to confer private contractual rights to a systematic or particular level of State funding in the future. See Pierce v. State, 121 N.M. 212, 910 P.2d 288, 300 (1995).
The fact that plaintiffs have no constitutionally-protected vested contract right in systematic funding of TPAF does not mean that the pension statutes confer no rights at all. There is a clear distinction between the right to receive pension benefits and the funding method adopted by the Legislature to assure that monies are available for the payment of such benefits. As to the former, N.J.S.A. 43:3C-9.5(b) provides that members "shall have a *297 non-forfeitable right to receive benefits as provided under the laws governing the retirement system or fund upon the attainment of five years of service credit in the retirement system or fund...." (emphasis added). The "non-forfeitable right" means "that the benefits program, for any employee for whom the right has attached, cannot be reduced." N.J.S.A. 43:3C-9.5(a). The essence of the right, acknowledged by the Attorney General, is the receipt of promised funds upon retirement, presumably at the rate fixed by law when such benefits were conferred. Indeed, the Attorney General concedes that in granting a non-forfeitable right to receive benefits, "the Legislature intended to create enforceable contractual rights."[14]
Yet plaintiffs' interest in the fund does not include oversight of its administration or extend to future appropriations by the Legislature. Indeed, the general pension statutes expressly deny "creat[ing] in any member a right in the corpus or management of a retirement system or pension fund." N.J.S.A. 43:3C-9.5(e)(2). Nor does the limited right conferred deny the Legislature the ability to fashion its ways and means in providing pension funding. Significantly, as noted, the State reserves the right to alter the retirement system and funds. N.J.S.A. 43:36-9.5(e)(1). To argue otherwisethat the pension statutes forever removed legislative power of amendmentwould run afoul of our State Constitution's Appropriations Clause, requiring that the State's finances be conducted on the basis of a single fiscal year covered by a single balanced budget, see N.J. Const. Art. VIII, § 2, ¶ 2; and Debt Limitation Clause, N.J. Const. Art. VIII, § 2, ¶ 3, prohibiting "`one Legislature from incurring debts which subsequent Legislatures would be obliged to pay, without prior approval by public referendum.'" City of Camden, supra, 82 N.J. at 152, 411 A.2d 462 (quoting New Jersey Sports & Exposition Auth., supra, 61 N.J. at 13-14, 292 A.2d 545). Thus, we read the funding provision of N.J.S.A. 43:3C-9.5(c) as not giving rise to an enforceable right in future appropriations, but rather as accommodating section (b) by stating the principle that the right of members to receive the benefits accruing to their past service was non-forfeitable because those benefits represented compensation, rather than a "gratuity" that the employer may withhold without cause. See Uricoli, supra, 91 N.J. at 71-73, 449 A.2d 1267 ("[T]here is a current, ongoing evolution away from the concept of a pension simply as a gratuitous benefit and toward an acceptance of it as deferred compensation for public employees upon retirement.") By not further extending that right, the Legislature preserved the ability of successor legislatures to decide the precise manner, method, and amount of pension funding.[15]
*298 In conclusion, we find no constitutionally-protected contract right to systematic funding of the TPAF. Any such right is foreclosed by: (1) our own constitutional jurisprudence, which never recognized such a right and in 1947 rejected a proposal that would have expressly designated public employee pension benefits as contractual; (2) well-settled constitutional principles placing limitations upon any legislature to bind its successors as to appropriations and impliedly suspending prior fiscal enactments by each annual Appropriations Act; (3) Supreme Court precedent in Spina, explicitly rejecting a "contractual" basis for State employee retirement benefits; and (4) current provisions of our pension statutes and their legislative history, which do not clearly and unambiguously evince a legislative intent to extend a non-forfeitable right to pension benefits to future appropriations. Having concluded there is no such constitutionally-protected contract right, we need not determine the prospective effect of the appropriations shortfalls in FY 2004-2007, and whether they constitute a "substantial impairment" in any constitutional sense.
Affirmed.
NOTES
[1] TPAF's fiscal year runs from July 1 to June 30.
[2] This contribution rate has been raised to 5.5% beginning in FY 2008. L. 2007, c. 103, § 1; N.J.S.A. 18A:66-29.
[3] For FY 2006-2008, the Treasurer lowered the regular interest rate of 8.75% to 8.25%.
[4] The market value of TPAF's assets grew from $28,618,463,144 in FY 2004 to $31,495,000,296 in FY 2006, while the actuarial value of assets grew from $34,633,790,549 in FY 2004 to $35,422,799,539 in FY 2006.
[5] From FY 2004 to 2007, the State's normal contribution grew at a steady rate, from $448.7 million to $560.1 million. Thus, in the appropriations acts for FY 2004-2006, the Legislature modified the provisions of Chapter 133 by authorizing assets in the BEF to be applied to the normal cost contribution and not just to the additional formula benefit cost. In FY 2006, as noted, the BEF balance was reduced to zero and the AFNC became part of the statutory contribution in FY 2007.
[6] See footnote 5, supra.
[7] The "funded ratio" is the ratio of the value of TPAF's current assets as of any particular valuation date to TPAF's total liability for current and future benefits accrued as of that date. According to Kent, funded status is the most important fact in gauging the long-term ability of the fund to pay benefits. The actuarial value of the TPAF grew from $34.7 billion as of June 30, 2003, to $35.4 billion as of June 30, 2006, while its market value increased from $26.4 billion to $31.5 billion during this same period.
[8] The court also denied plaintiffs' motion to file a fourth amended complaint.
[9] The contract clause is not "an absolute bar to subsequent modification of a State's own financial obligations[,]" because "an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." U.S. Trust Co. v. New Jersey, 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92, 111-12 (1977). Even if the State action amounts to a substantial impairment of a contractual relationship, to be unconstitutional it "must lack a significant and legitimate public purpose" and "must be based upon unreasonable conditions and be unrelated to appropriate governmental objectives." State Farm Mut. Auto. Ins. Co. v. State, 124 N.J. 32, 64, 590 A.2d 191 (1991). The public purpose is limited to "the remedying of a broad and general social or economic problem," but it is not required to be an "emergency[.]" Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 412, 103 S.Ct. 697, 704-05, 74 L.Ed.2d 569, 581 (1983).
[10] On the other hand, the question of whether there has been an impairment of a vested contractual right is a mixed question of fact and law. See Teachers' Retirement Board v. Genest, 154 Cal.App.4th 1012, 65 Cal.Rptr.3d 326, 337 (2007).
[11] A delegate introduced Proposal Number 11, which would have provided that "benefits payable by virtue of membership in any State pension or retirement system shall constitute a contractual relationship and shall not be diminished or impaired." Proceedings of the New Jersey Constitutional Convention of 1947, vol. I at 73. That proposal was referred to the Committee on Rights, Privileges, Amendments, and Miscellaneous Provisions. Id., vol. I at 73-74. A representative of the New Jersey Education Association testified about the need for such protection, and mentioned the existence of such a provision in the New York constitution. Id., vol. III at 103-06. Other public employee organizations took the same position. Id., vol. V at 494-95, 519-20. The Committee voted against the proposal. Id., vol. III at 192.
[12] Cal. Gov't Code §§ 20751, 20752 and 20757 were repealed in 1995 (Stats. 1995, ch. 379, § 1, p.1955) and similar provisions are now found in Cal. Gov't Code §§ 20822, 20824 and 20830. Section 20830 provides "[a]ll payments required ... to be made by the state to the retirement fund, are continuing obligations of the state."
[13] The Legislature enacted the word "continued" only once in connection with TPAF, in 1994, in a general characterization of the ongoing principles of sound management that the technical amendments were intended to further. The word was not added to any of the operative provisions that actually direct the calculation or payment of contributions.

A variant of "continued," the word "continuing," also appears only once, and its appearance is in the legislative history for a different corrective amendment. When the Senate Education Committee stated that the amendment reflected the State's "continuing responsibility to pay the pension ... contributions for members ... who are employees of institutions of higher education[,]" S. Educ. Comm. Statement. S. No. 3163L. 1991, c. 246, it meant only that the State had not intended a prior amendment to N.J.S.A. 18A:66-33that was supposed to be limited to having the local school districts replace the State as the entity responsible for the employer's contributions to TPAF for the districts' employeesto interrupt the State's status as the entity making those contributions.
[14] As to this non-forfeitable right, no evidence was adduced in the Law Division that plaintiffs, or any members of TPAF for that matter, have been deprived of their vested benefits as a consequence of State funding decisions. As noted, even plaintiff's expert agreed with defendants' expert that TPAF will continue to have enough assets for at least the next thirty years, despite the funding gap of FY 2004-2007. Thus, there has been no impairment much less a substantial oneof plaintiffs' non-forfeitable right to receive accrued pension benefits.
[15] The legislative history of N.J.S.A. 43:3C-9.5 is highly instructive. Senate Bill 1119, which later became Chapter 113 of the laws of 1997, and codified in N.J.S.A. 43:3C-9.5, was the subject of a legislative hearing before a State Senate Committee on May 10, 1996. At the time, a representative of the New Jersey Teachers' Association urged adoption of an alternate proposal, S. 1132, rather than S. 1119. The S. 1132 proposal sought to establish in vested members of TPAF "a contractual property right to a secure and financially sound retirement system." However, that version was not adopted and S. 1119, to which the "non-forfeitable right" language was later added, was ultimately enacted in Chapter 113.