NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-5973-11T4
             A-6002-11T4
             A-0632-12T1

RICHARD W. BERG, ROBERT J. BRASS,
THOMAS CANNAVO, MELAINE B. CAMPBELL,
LARRY ROBERT ETZWEILER, KATHY FLICKER,
ARNOLD GOLDEN, CHARLES GRINELL, TONI
A. HENDRICKSEN, HAROLD KASSELMAN,
SUSAN LOTHIAN, STEPHEN H. MONSON,
MARTIN C. MOONEY, SR., BRIAN MULHOLLAND,
CHARLES OUSLANDER, ANNE C. PASKOW,
SHARYN PEIFFER, SAMUEL REAL, JR.,
GREGORY J. SAKOWICZ, SUSAN W. SCIACCA,
WILLIAM H. SCHMIDT, FRED SCHWANWEDE,
JOHN J. SMITH, DEBRA STONE, SHERI TANNE,
and JACK L. WEINBERG,

> Plaintiffs-Appellants,

and

NEW JERSEY EDUCATION ASSOCIATION,
NEW JERSEY STATE POLICEMEN'S BENEVOLENT
ASSOCIATION, INC., COMMUNICATIONS WORKERS
OF AMERCA, AFL-CIO, NEW JERSEY FRATERNAL
ORDER OF POLICE, NEW JERSEY STATE
FIREFIGHTERS' MUTUAL BENEVOLENT
ASSOCIATION, PROFESSIONAL FIREFIGHTERS
ASSOCIATION OF NEW JERSEY, AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, COUNCIL 1, AFL-CIO, AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, COUNCIL 73, AFL-CIO, AMERICAN
FEDERATION OF TEACHERS NEW JERSEY STATE
FEDERATION, AFL-CIO, INTERNATIONAL
FEDERATION OF PROFESSIONAL AND TECHNICAL
EMPLOYEES, AFL-CIO, LOCAL 194,
INTERNATIONAL FEDERATION OF PROFESSIONAL
AND TECHNICAL EMPLOYEES, AFL-CIO, LOCAL
195, INTERNATIONAL FEDERATION OF

---

**APPROVED FOR PUBLICATION**

**June 26, 2014**

**APPELLATE DIVISION**

PROFESSIONAL AND TECHNICAL EMPLOYEES, AFL-CIO, LOCAL 200, PROBATION ASSOCIATION OF NEW JERSEY, NEWARK FIREFIGHTERS UNION, MORRIS COUNCIL NOS. 6 AND 6A, NJCSA, IFPTE, ALF-CIO, JERSEY CITY POLICE OFFICERS BENEVOLENT ASSOCIATION, CAMDEN COUNTY COUNCIL #10, INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 97, BELLEVILLE PBA LOCAL 28, NEW JERSEY ASSOCIATION OF SCHOOL ADMINISTRATORS, NEW JERSEY PRINCIPALS AND SUPERVISORS ASSOCIATION, NEW JERSEY ASSOCIATION OF SCHOOL BUSINESS OFFICIALS, NEW JERSEY RETIREES' EDUCATION ASSOCIATION, TRANSPORT WORKERS UNION LOCAL 225, NEW JERSEY SUPERIOR OFFICERS LAW ENFORCEMENT ASSOCIATION, ATLANTIC CITY WHITE COLLAR PROFESSIONAL ASSOCIATION, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 210, ATLANTIC CITY SUPERIOR OFFICERS ASSOCIATION, PETER BURKHALTER, DEE TRUCHON, GEORGE O'BRIEN, THOMAS TEVLIN, ROBERT BROWER, ROSEMARIE JANKOWSKI, IRIS J. ELLIOTT, KENNETH D. KING, FRANK ELMER HICKS, WILLIAM A. PARKER, BRAD FAIRCHILD, DWIGHT COVALESKI, ANTHONY F. WIENERS, GARY SOUSS, WILLIAM LAVIN, CHARLES WEST, MARIAN LEZGUS, MELANIE HAFDELIN, STEVEN ENGRAVALLE, CINDY BARR-RAGUE, DOMINICK MARINO, JOHN J. GEROW, JANET S. ZYNROZ, ALFRED CRESCI, RAE C. ROEDER, MARYANN PIUNNO SMITH, MARYANN MESICS, DENNIS REITER, ANTHONY MISKOWSKI, VINCENT KAIGHN, WILLIAM S. BAUER, JR., MICHAEL CALABRESE, and DEBORAH JACOBS,

     Plaintiffs/Intervenors-Appellants,

v.

HON. CHRISTOPHER J. CHRISTIE, HON. KIM GUADAGNO, SECRETARY OF STATE OF THE STATE OF NEW JERSEY, DIRECTOR, DIVISION OF PENSIONS, BOARD OF TRUSTEES, PUBLIC EMPLOYEES' RETIREMENT SYSTEM, TREASURER, STATE OF NEW JERSEY and STATE OF NEW

JERSEY,

     Defendants-Respondents.

_____

MICHAEL DeLUCIA, PATRICIA DeLUCIA,
ROBERT C. BROWN and ANNE K. BROWN,

     Plaintiffs-Appellants,

v.

STATE OF NEW JERSEY, DEPARTMENT
OF THE TREASURY, DIVISION OF
PENSIONS AND BENEFITS,

     Defendants-Respondents.

_____

     Argued January 28, 2014[1] — Decided June 26, 2014

     Before Judges Reisner, Alvarez and Carroll.

     On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket Nos. L-2996-11 and L-1354-12.

     Daniel Louis Grossman argued the cause for appellants Berg, Brass, Cannavo, Campbell, Etzweiler, Flicker, Golden, Grinell, Hendricksen, Kasselman, Lothian, Monson, Mooney, Mulholland, Paskow, Peiffer, Real, Sakowicz, Sciacca, Schmidt, Schwanwede, Smith, Stone, Tanne, and Weinberg in A-5973-11.

     Charles Ouslander, appellant, argued the cause pro se in A-5973-11.

     Kenneth I. Nowak, Ira W. Mintz and David I. Fox argued the cause for appellants in A-6002-11 (Zazzali, Fagella, Nowak, Kleinbaum & Friedman,

---

[1] After oral argument, we directed supplemental briefing, which was completed on February 25, 2014.

P.C., attorneys for appellants New Jersey Education Association, New Jersey Retirees' Education Association, New Jersey State Policemen's Benevolent Association, Inc., American Federation of State, County and Municipal Employees, Council 1, AFL-CIO, Belleville PBA Local 28, George O'Brien, Rosemarie Jankowski, Iris J. Elliott, William A. Parker, Anthony Wieners, Gary Souss, Marian Lezgus, and Melanie Hafdelin; Weissman & Mintz, L.L.C., attorneys for appellants Communications Workers of America, AFL-CIO, American Federation of State, County and Municipal Employees, Council 73, International Federation of Professional and Technical Engineers, AFL-CIO & CLC, Local 194, International Federation of Professional and Technical Engineers, AFL-CIO & CLC, Local 200, Peter Burkhalter, Dee Truchon, Rae C. Roeder, Maryann Piunno Smith, Maryann Mesics, Dennis Reiter, Anthony Miskowski, Vincent Kaighn, William S. Bauer, Jr., Michael Calabrese, and Deborah Jacobs; Fox and Fox, L.L.P., attorneys for appellants New Jersey State Firefighters' Mutual Benevolent Association of New Jersey, Probation Association of New Jersey, Newark Firefighters Union Morris Council Nos. 6 and 6A, NJCSA, IFPTE, AFL-CIO, Thomas Tevlin, Robert Brower, Brad Fairchild, Dwight Covaleski, William Lavin, and Charles West; Markowitz and Richman, attorneys for appellant New Jersey Fraternal Order of Police; Mets Schiro & McGovern, L.L.P., attorneys for appellants Professional Firefighters Association of New Jersey, American Federation of Teachers New Jersey Federation, AFL-CIO, International Brotherhood of Teamsters Local 97, Dominick Marino, and John Gerow; Oxfeld Cohen, P.C., attorneys for appellant International Federation of Professional and Technical Engineers, AFL-CIO & CLC, Local 195; Detzky & Hunter, L.L.C., attorneys for appellant Jersey City Police Officers Benevolent Association; Spear Wilderman, P.C., attorneys for appellant Camden County Council #10; Robert M. Schwartz, attorney for appellants New Jersey Principals and Supervisors Association, Janet S. Zynroz, and Alfred Cresci; O'Brien, Belland & Bushinsky,

L.L.C., attorneys for appellants Transport Workers Union Local 225, New Jersey Superior Officers Law Enforcement Association, Atlantic City White Collar Professional Association, International Brotherhood of Electrical Workers Local 210, and Atlantic City Superior Officers Association; Maria M. Lepore, attorney for appellants New Jersey Association of School Administrators, Kenneth D. King, and Steven Engravalle; and Lindabury, McCormick, Estabrook & Cooper, P.C., attorneys for appellants New Jersey Association of School Business Officials, Frank Elmer Hicks, and Cindy Barr-Rague; Mr. Nowak, Mr. Mintz, Edward M. Suarez, Jr., Steven P. Weissman, Matthew D. Aremen, Mr. Fox, Craig S. Gumpel, James M. Mets, Kevin P. McGovern, Arnold Shep Cohen, Stephen B. Hunter, James Katz, Mr. Schwartz, Kevin Jarvis, Ms. Lepore, and Paul E. Griggs, on the joint briefs).

Robert T. Lougy, Assistant Attorney General, argued the cause for respondents in A-5973-11 and in A-6002-11 (John J. Hoffman, Acting Attorney General, attorney; Mr. Lougy, of counsel; Jean P. Reilly, Deputy Attorney General, and Diane J. Weeden, Deputy Attorney General, on the briefs).

Robert C. Brown argued the cause for appellants in A-0632-12.

Diane J. Weeden, Deputy Attorney General, argued the cause for respondents in A-0632-12 (John J. Hoffman, Acting Attorney General, attorney; Robert T. Lougy, Assistant Attorney General, of counsel; Jean P. Reilly, Deputy Attorney General, and Ms. Weeden, on the briefs).

The opinion of the court was delivered by

REISNER, P.J.A.D.

In these appeals, which we have consolidated for purposes of this opinion, several groups of public-employee plaintiffs challenge the constitutionality of N.J.S.A. 43:3B-2 (Chapter

78), a 2011 statute that suspended the payment of cost of living increases (COLAs) to current and future retirees receiving pensions from each of the State's public pension funds.  See L. 2011, c. 78, § 25.  The trial court dismissed the complaints on summary judgment.  For the reasons that follow, we affirm the grant of summary judgment in DeLucia v. State of New Jersey, A-0632-12.  We reverse the grant of summary judgment in Berg and New Jersey Education Association v. Christie (Berg), A-5973-11 and A-6002-11, and we remand Berg to the trial court for further proceedings required to address plaintiffs' Contract Clause claims under the New Jersey Constitution.

I

The State pension systems have been addressed at length in a number of recent opinions.  See, e.g., Teamsters Local 97 v. State, 434 N.J. Super. 393, 407-25 (App. Div. 2014); N.J. Educ. Ass'n v. State, 412 N.J. Super. 192, 214-15 (App. Div.), certif. denied, 202 N.J. 347 (2010).  Nonetheless, for the sake of clarity, we find it necessary to review the history in detail, since "[t]he legal issues must be viewed realistically against the story of these pension plans."  Spina v. Consol. Police & Firemen's Pension Fund Comm'n, 41 N.J. 391, 393 (1964).  Likewise, because this litigation has been conducted in several

different courts, we discuss its procedural history in greater detail than we otherwise might.

THE PENSION SYSTEMS

Resolution of this appeal requires a review of the statutory framework and history surrounding the: 1) State-administered retirement systems; 2) Pension Adjustment Act, N.J.S.A. 43:3B-1 to -10; and 3) non-forfeitable rights statute, N.J.S.A. 43:3C-9.5. We will discuss that framework here.

A. The State-Administered Retirement Systems

Plaintiffs in Berg are a group of twenty-six retired attorneys who are currently receiving pension benefits through the Public Employees' Retirement System (PERS), N.J.S.A. 43:15A-1 to -141. PERS was established in 1954, L. 1954, c. 84, and is the largest of the State-administered retirement systems. N.J.S.A. 52:18A-108(c). The intervenors in Berg are retired and active vested members in the three largest state-administered defined benefit retirement systems: 1) PERS; 2) the Police and Firemen's Retirement System (PFRS), established in 1944, L. 1944, c. 253, under N.J.S.A. 43:16A-1 to -16.2; and 3) the Teachers' Pension and Annuity Fund (TPAF), reorganized in 1955, under N.J.S.A. 18A:66-1 to -93. The DeLucia plaintiffs are retired members of PFRS.

PERS, PFRS, and TPAF are governed by separate boards of trustees. N.J.S.A. 43:15A-17 (PERS); N.J.S.A. 43:16A-13 (PFRS); and N.J.S.A. 18A:66-56 (TPAF). The day-to-day administration of the retirement systems is conducted by the Department of the Treasury, Division of Pensions and Benefits. N.J.S.A. 52:18A-95 to -100 (Division of Pensions); N.J.S.A. 43:15A-18 (PERS); N.J.S.A. 43:16A-13 (PFRS); N.J.S.A. 18A:66-57 (TPAF). Employees are vested in these systems after having obtained ten years of service credit. N.J.S.A. 43:15A-38 (PERS); N.J.S.A. 43:16A-11.2 (PFRS); N.J.S.A. 18A:66-36 (TPAF).

The State-administered retirement systems are funded by: 1) contributions from employees' wages; 2) contributions from the State, as the employer; and 3) the return earned on invested assets. N.J.S.A. 43:15A-24 (PERS); N.J.S.A. 43:16A-15 (PFRS); N.J.S.A. 18A:66-18 (TPAF). See also N.J. Educ. Ass'n, supra, 412 N.J. Super. at 214-15 (describing TPAF statutory funding and contribution scheme). Employees' contributions to the systems are set by statute as a percentage of salary. N.J.S.A. 43:15A-25 (PERS); N.J.S.A. 43:16A-15 (PFRS); N.J.S.A. 18A:66-29 (TPAF).

The State's contributions are computed by actuaries, who act as technical advisors to the board of trustees, based on an annual valuation of the assets and the fund liabilities. N.J.S.A. 43:15A-24 (PERS); N.J.S.A. 43:16A-16 (PFRS); N.J.S.A.

18A:66-16 (TPAF). See Passaic v. Consol. Police Pension Fund Comm'n, 18 N.J. 137, 140-41 (1955) (explaining in simple terms the theory of pension funding and the actuary's role). As the Division of Pensions explained in its Employers' Pension and Benefits Administration Manual (EPBAM), in the State pension systems the employer is essentially "responsible for filling the gap between the funds needed to meet the retirement system obligations and those available from employee contributions and investment earnings on system assets." Employers' Pension and Benefits Administration Manual (EPBAM), http://www.nj.gov/treasury/pensions/epbam/pensions/funding1.htm (last visited June 12, 2014).[2]

The State is statutorily required to contribute, to each system or fund, both a "normal contribution," which includes basic retirement allowances and COLAs as determined by the board of trustees in consultation with the system's or fund's actuary, and an accrued liability contribution. N.J.S.A. 43:3C-9.5(c)(1). "The amount of the State's annually required contributions shall be included in all annual appropriations acts as a dedicated line item," N.J.S.A. 43:3C-9.5(c)(1), and

---

[2] Because the appellate record consists only of materials submitted to the trial court, R. 2:5-4, internet citations in this opinion are to materials that were either the subject of stipulations in the trial court or to public documents of which we can take judicial notice. See N.J.R.E. 201.

the Legislature "shall make an appropriation sufficient to provide for the obligations of the State."  N.J.S.A. 43:15A-37 (PERS); N.J.S.A. 18A:66-33 (TPAF).  Commencing July 1, 2011, the State's contribution

> shall be made in full each year to each
> system or fund in the manner and at the time
> provided by law.  The contribution shall be
> computed by actuaries for each system or
> fund based on an annual valuation of the
> assets and liabilities of the system or fund
> pursuant to consistent and generally
> accepted actuarial standards and shall
> include the normal contribution and the
> unfunded accrued liability contribution.
> The State with regard to its obligations
> funded through the annual appropriations act
> shall be in compliance with this requirement
> provided the State makes a payment, to each
> State-administered retirement system or
> fund, of at least 1/7th of the full
> contribution, as computed by the actuaries,
> in the State fiscal year commencing July 1,
> 2011 and a payment in each subsequent fiscal
> year that increases by at least an
> additional 1/7th until payment of the full
> contribution is made in the seventh fiscal
> year and thereafter.
>
> [N.J.S.A. 43:3C-14.]

The money in the pension funds is held in trust for the exclusive use of the members or their beneficiaries.  N.J.S.A. 43:3C-9.1.

B.  The Pension Adjustment Act

In 1958, at approximately the same time that PERS, PFRS, and TPAF were established, the Pension Adjustment Act, N.J.S.A.

43:3B-1 to -10, was adopted.  L. 1958, c. 143.  The Act provided for limited modest increases, based on a fixed adjustment, to the first $480 of the retirement allowances of state employees (including members of PERS, PFRS, and TPAF), who had retired before 1952, that is, prior to the advent of Social Security coverage for public employees.  L. 1958, c. 143.  The State, as employer, bore the cost of the adjustments (except TPAF), which were, as initially enacted, to be made on a "pay-as-you-go" basis and were subject to appropriation by the Legislature.  L. 1958, c. 143.  The Sponsor's Statement to the bill explained:

> This bill is intended to meet in some part the situation that exists for certain former public employees who, having retired on pensions based on the salary levels of many years ago, now face varying degrees of hardship because of serious increases in the cost of living since their retirement.  Some of these retired employees have in fact been obliged to seek old age assistance, and it is expected that this bill will provide an alternative for them on a more dignified, even-handed basis. There is no attempt in this bill to suggest the general need for a cost-of-living index, or an escalator clause, for pension or retirement systems. The great majority of New Jersey's public employees have been covered under the Federal Old Age and Survivors' Insurance program in recent years, and the benefits payable under this program have tended to increase with increases in the cost of living, thus the problem may not be as severe in the future.

> A cut-off point, beyond which no adjustment of pension would be made, is, of

necessity, arbitrary, but, in this bill, the factors have been continued to a date low enough, 1951 (13% increase in the basic amount), to represent liberal treatment of the meaning of "hardship." No increase is provided in those cases where the ratio of increase would be so small that the average taxpayer usually must adjust to it in his own personal way; in fact, an extension of the schedule of increases into this area would involve the State in administrative costs utterly disproportionate to the benefits that would result.

[Sponsor's Statement to Assembly Bill No. 367, at 4-5 (March 24, 1958) (emphasis added).]

In 1961, the Act was amended to increase the retirement allowance by applying an increased percentage adjustment to the first $600 in benefits, and by adding employees who had retired in 1952, 1953 and 1954. L. 1961, c. 144. The Sponsor's Statement explained:

The adjustment formula is intended to overcome the loss of real income by a retired person as a result of constantly rising prices. . . .

. . . .

The Pension Increase Act of 1958 now provides for increases to persons retired prior to January 1, 1952. This date marked the point where the Inadequate Pensions Committee formula showed a loss of at least 10% in purchasing power due to inflation after retirement. Since 1958 the cost of living has continued to rise and the fixed incomes of retired public employees have been reduced still further in purchasing power. The present bill applies the

12

> committee formula to correct this . . . .
> This adjustment preserves the principle that
> no increase should be provided unless the
> loss of purchasing power is at least 10%.
>
> [Sponsor's Statement to Assembly Bill No.
> 559, at 3-4 (May 1, 1961).]

In 1964, the statute was amended to apply the percentage adjustment to the first $900 in retirement allowance. L. 1964, c. 198, § 1. Then Governor Hughes confirmed that the "program extends only to those who retired prior to 1955 and prior to the advent of Social Security coverage." Governor's Statement upon Signing Assembly Bill No. 610, L. 1964, c. 198 (Oct. 13, 1964).

The first major revision to the Act was made in 1969, when the Act was amended to: 1) grant adjustments or COLAs to all eligible retirants of state-administered pension systems, not just those who retired before 1955; and 2) provide adjustments based on an amount equal to one-half of the percentage of the change in the Consumer Price Index (CPI), not a fixed formula. L. 1969, c. 169, § 1. See Brown v. Twp. of Old Bridge, 319 N.J. Super. 476, 511 (App. Div.) (increases in annual COLAs are calculated by reference to CPI to protect retirees from increased inflation), certif. denied, 162 N.J. 131 (1999). The Sponsor's Statement explained:

> This bill will help protect retired
> public employees against excessive loss of
> purchasing power caused by inflation. The
> bill is partially based on existing

A-5973-11T4

legislation which provides for fixed increases to certain public pensioners. This bill does the following:

1. It provides that those who retired prior to 1955 (prior to . . . Social Security coverage . . .) will receive an increase in accordance with the changes in the cost of living appropriate to their calendar year of retirement as such percentage of increase will be applied to the full allowance of the retirant rather than to any part of that allowance.

2. It permits adjustments for most retirants effective, July 1, 1970 <u>if funds are appropriated to provide for such increases</u>.

3. It requires the Director of the Division of Pensions to review the increase in the cost of living based on the Consumer Price Index issued by the United States Department of Labor and to include in his appropriation request . . . amounts sufficient to increase the retirement allowances or pensions of eligible retirants by 1/2 of the percentum of change in the index.

4. The legislation contemplates an annual review of the index <u>and permits adjustments upwards or downwards</u>, as the case may be, in order to maintain the purchasing power of the retired public employee.

[<u>Sponsor's Statement to Assembly Bill No. 292</u>, at 6-7 (Jan. 27, 1969) (emphasis added).]

From 1982 to 1991, the State retirement systems grew dramatically, and the growth in assets and the return on retirement investments far outpaced the growth in benefit payments from the retirement systems. <u>Sponsor's Statement to</u>

14                                                    A-5973-11T4

Senate Bill No. 540, at 28 (March 12, 1992), (L. 1992, c. 41). During that period pension adjustments were enhanced, and the Act was amended to: 1) expand COLAs to include survivors, L. 1971, c. 139; 2) reduce the lag time for updating the CPI adjustment, L. 1975, c. 375; 3) increase the percentage of adjustment from 50% to 60% of the CPI, L. 1977, c. 306; and 4) provide for payment for the entire month in which the retirant dies, L. 1993, c. 335.

From 1987 to 1990, the Act was amended, with regard to funding, to: 1) provide that COLAs were to be prefunded by employers, rather than on a pay-as-you-go basis; and 2) that COLA payments shall be paid by the retirement system and funded as employer obligations by the same method provided by law for funding of employer obligations for the basic retirement benefits. N.J.S.A. 43:3B-4a (TPAF); N.J.S.A. 43:3B-4.2 (PFRS); N.J.S.A. 43:3B-4.3 (PERS).[3] As the Division of Pensions stated in the EPBAM: "An employer's contribution to one of the State's defined benefit plans covers not only the cost of basic pension allowances, but also future cost-of-living adjustments (COLA)." EPBAM, http://www.nj.gov/treasury/pensions/epbam/

---

[3] The laws governing the state-administered retirement systems were amended in conformance with the funding provisions. N.J.S.A. 43:15A-24.1 (PERS); N.J.S.A. 43:16A-15.6 (PFRS); N.J.S.A. 18A:66-18.1 (TPAF).

pensions/funding1.htm (last visited June 12, 2014). The Sponsor's Statement to the PERS bill, L. 1990, c. 6, explained:

> The bill provides for adequate reserve funding for pension adjustment benefits for all members of [PERS] . . . for retirees and their dependents for which the State is required to pay the premiums. At present, these benefits are paid for on a current basis by the State and other employers. The liability for these benefits for active and retired members is growing rapidly. If steps are not taken soon to recognize and provide reserve funding for this liability, a severe fiscal crisis could develop in the future requiring payment of these benefits out of the current operating budgets of the State and local employers. Reserve funding of these liabilities can also provide savings through investment earnings.
>
> The bill provides that pension adjustment benefits for all PERS members, and beneficiaries and post-retirement health care benefits for qualified, retired State employees and their dependents shall be paid by the retirement system. The liability for pension adjustment benefits will be funded as employer obligations of the State and local employers participating in the retirement system.
>
> [Sponsor's Statement to Senate Bill No. 665, at 3 (March 8, 1990).]

The Senate Revenue, Finance and Appropriations Committee's Statement set forth that the bill provided for the "recognition of . . . (COLA) payments as a liability of the PERS system." Committee's Statement to Senate Bill No. 665, at 1 (Feb. 5, 1990). See also Governor's Statement upon Signing Senate Bill

No. 2602, L. 1989, c. 204 (Dec. 19, 1989) (prefunding mechanism will result in substantial savings to urban municipalities).

C.   The Genesis of the Current Pension Dispute

Beginning in the mid-1990's, a series of Executive and Legislative policy decisions — which the State later characterized as short-sighted — resulted in underfunding of the pension systems. As described in then Governor Corzine's February 24, 2008, Budget Summary presented to the Legislature:

> The seeds of this problem were sown in the mid-1990s, when New Jersey sold pension bonds and revalued its pension investments (from their original "book" value to their current market value). These tactics enabled the State to avoid making its normal appropriations into the system, thus relinquishing those resources to support other programs. The pension funds were invested in the stock market and, initially, produced a sizeable balance. That balance provided a convenient rationalization for two things: 1) the elimination of State and local government contributions (i.e., pension "holidays") totaling an estimated $8 billion over seven years; and 2) an expansion of benefits through changes in the calculation of pension benefit payments. From fiscal 1997 through 2005, no appropriations were made to . . . (PERS), the State's largest system. Similarly, from fiscal 2000 through 2005, no appropriations were provided to the next largest system . . . (TPAF).
>
> Beginning in fiscal 2000, however, the value of the State's pension investments declined precipitously due to the stock market crash, resulting in an asset loss of approximately $20 billion (24%) by the end

17                                                    A-5973-11T4

of fiscal 2002.  Income tax receipts over this same period also were adversely affected.  However, instead of instituting deep program cuts to re-align budget expenses with available revenues, the State shorted the pension system by substituting excess pension assets in place of the normal cash appropriation.  The Benefit Enhancement Fund, which was originally created to support some of the aforementioned benefit expansions, was also tapped for this purpose.

This combination of asset losses and increased benefits triggered a rapid and steady increase in the system's unfunded liability (i.e., degree to which the actuarially-determined obligations exceed the value of pension assets).  From fiscal 2004 to the present, the unfunded liability more than doubled, from $12 billion to approximately $25 billion, of which $16.6 billion represents the State's liability.

[FY 2009 Budget In Brief, Executive Summary, at 19.]

D.  The Non-forfeitable Right Statute

In 1997, the Legislature introduced a bill, signed into law on June 5, 1997, conforming the administration of certain State-administered retirement systems, including PERS, PFRS, and TPAF, to federal Internal Revenue Code requirements; however, the bill also established "certain non-forfeitable" pension rights.  L. 1997, c. 113, § 2.[4]  Significant to this appeal, the law provided

_____

[4] As further discussed in Part III of this opinion, the 1997 statute followed an investigation by the Internal Revenue Service, aimed at requiring the State to repay sums removed from

(continued)

18                                    A-5973-11T4

that vested members "shall have a non-forfeitable right to receive benefits as provided under the laws governing the retirement system or fund upon the attainment of five years of service credit in the retirement system or fund . . . ." N.J.S.A. 43:3C-9.5(b). "[A] 'non-forfeitable right to receive benefits' means that the benefits program, for any employee for whom the right has attached, cannot be reduced. The provisions of this section shall not apply to post-retirement medical benefits which are provided pursuant to law." N.J.S.A. 43:3C-9.5(a). Nonetheless, N.J.S.A. 43:3C-9.5(e) provided:

> Except as expressly provided herein and only to the extent so expressly provided, nothing in this act shall be deemed to (1) limit the right of the State to alter, modify or amend such retirement systems and funds, or (2) create in any member a right in the corpus or management of a retirement system or pension fund . . . .

The Senate Budget and Appropriations Committee's Statement to L. 1997, c. 113 explained:

> The bill also provides that a vested member of a retirement system or fund listed in the bill will have non-forfeitable right to receive benefits as provided under the laws governing the retirement system or fund upon the attainment of five years of service credit in the system or fund or on the date

_____

(continued)
the pension funds. The statute was intended to ensure that the pension funds would continue to qualify for favorable federal tax treatment.

A-5973-11T4

of the enactment of the bill, whichever is later. However, this provision of the bill will not apply to postretirement medical benefits which are provided pursuant to law. The bill also requires the State to make an annual normal contribution and an annual unfunded accrued liability contribution to each system and fund except under two circumstances set forth in the bill.

The bill will not preclude the forfeiture, suspension or reduction of benefits for dishonorable service. In addition, the right to receive benefits will not be deemed to: (1) limit the right of the State to alter, modify or amend the retirement systems, other than the abovementioned benefits for members who have attained 10 years of service, or (2) create in any member a right in the corpus or management of a retirement system.

[Committee's Statement to Senate Bill No. 1119, at 1-2 (April 17, 1997).]

With regard to the fiscal impact of L. 1997, c. 113, the Senate Budget and Appropriations Committee set forth that:

As amended, the bill establishes a "nonforfeitable" right to certain pension benefits after five years of service credit for vested employees. The fiscal impact of this provision, if any, cannot be calculated because any impact would only occur as the result of future statutory changes in pension benefits which cannot be foreseen.

[Committee's Statement to Senate Bill No. 1119, at 2 (April 17, 1997).]

In 2010, the Legislature introduced Senate Bill Nos. 2, 3, and 4, which were passed and signed into law on March 22, 2010. The "bills implemented some of the recommendations of the Joint

<u>Legislative Committee on Public Employee Benefits Reform, Final</u> <u>Report</u> (Dec. 1, 2006) (Final Report) . . . ." <u>See</u> <u>Paterson</u> <u>Police PBA Local 1 v. City of Paterson</u>, 433 <u>N.J. Super.</u> 416, 419-21 (App. Div. 2013) (describing history of bills and provisions of Final Report). The Final Report was created to identify "proposals that will terminate abuses of the pension systems and control the cost of providing public employee retirement, health care and other benefits." <u>Final Report</u>, <u>supra</u>, at 1. The Committee found that as of 2006, New Jersey's retirement systems had an $18 billion unfunded liability. <u>Ibid.</u> The main contributors to that liability were: 1) "State and local government employer pension 'holidays' totaling $8 billion over seven years; [2)] [N]egative investment returns resulting in a $20 billion loss; [3)] Costly pension benefit enhancements and early retirement incentive programs; and [4)] Continuous increases in enrollment." <u>Ibid.</u>

Relevant to this appeal, <u>Senate No. 2</u>, enacted at <u>L.</u> 2010, <u>c.</u> 1, § 29, and codified as amended at <u>N.J.S.A.</u> 43:3C-9.5(b), removed public employees who had become vested members of the State-administered retirement systems on or after May 21, 2010 (the bill's effective date), from the "non-forfeitable right" provision. Under this provision new members of the State-administered retirement systems do not have a non-forfeitable

right to receive retirement benefits upon the attainment of five years of service credit.  N.J.S.A. 43:3C-9.5(b).

The Sponsor's Statement to L. 2010, c. 1, explained that:

> This section implements Recommendation 7 of the Joint Legislative Committee on Public Employee Benefits Reform set forth in the final report dated December 1, 2006. The committee recommended "the repeal on a prospective basis for new employees of N.J.S.A. 43:3C-9.5 . . . because the Legislature should not be permanently and inextricably bound by an action of a prior session of the Legislature."
>
> The bill would remove public employees who become members after the bill's effective date of the [PERS, PFRS, and TPAF] . . . from the law that provides vested members with a non-forfeitable right to receive benefits, as provided under the laws governing the retirement system or fund, upon the attainment of five years of service credit in the retirement system or fund.
>
> [Sponsor's Statement to Senate Bill No. 2, at 74 (Feb. 8, 2010).]

Significantly, Recommendation 7 of the Joint Committee's Final Report, upon which the Legislature relied, provided:

> In a legal opinion to the Joint Committee, Peter J. Kelly, Principal Counsel, the Office of Legislative Services (OLS), explained that "legislation that has the effect of detrimentally altering the retirement benefits of active members of State-administered retirement systems who have accrued at least five years of service credit, or of retired members, would be unconstitutional as violative of the federal and State constitutional proscription against impairment of the obligation of

22

contract." . . . Similarly, in a legal opinion for New Jersey's Treasurer, Bradley Abelow, the Office of the Attorney General advised that "N.J.S.A. 43:3C-9.5 created legally enforceable rights in vested members of the state pension systems to the benefits programs of those systems" and consequently under "the State and Federal Constitutions, the Legislature may not enact laws which substantially impair those rights, except in the narrow circumstances recognized by state and federal courts."

. . . .

Repeal of N.J.S.A. 43:3C-9.5 should be prospective only, that is, it should apply to those employed after the repeal. The OLS legal opinion pointed out that because the statute "created a contractual right for the members to whom it is applicable, any subsequent amendment or repeal thereof would not extinguish the rights conferred on those members."

· **RECOMMENDED ACTION**

The Joint Committee recommends the repeal on a prospective basis for new employees of N.J.S.A. 43:3C-9.5, which provides members of the State-administered retirement systems with a non-forfeitable right to receive in retirement the benefits provided by statute at the time a member of a retirement system attains five years of service credit. . . . [T]he Legislature should not be permanently and inextricably bound by an action of a prior session of the Legislature.

[Final Report, supra, at 77-79 (emphasis added).]

In its Final Report the Committee concluded that:

Detrimentally altering the retirement benefits of active members of the retirement

23

> systems who have accrued at least five years
> of service credit, or of retired members,
> would be unconstitutional as an impairment
> of contract based on a legal opinion
> provided by the nonpartisan Office of
> Legislative Services and similar legal
> advice prepared by the Office of the
> Attorney General for the State Treasurer.

[<u>Id.</u> at 1 (emphasis added).]

In 2011, however, the Legislature made significant changes to public employee pension and health care benefits, including the suspension of automatic COLAs for current and future retirees.  <u>L.</u> 2011, <u>c.</u> 78, § 25 (codified as amended at <u>N.J.S.A.</u> 43:3B-2(a)).  The statute provides that commencing on June 28, 2011,

> no further adjustments to the monthly
> retirement allowance or pension originally
> granted to any retirant and the pension or
> survivorship benefit granted to any
> beneficiary shall be made in accordance with
> the provisions of <u>P.L.</u>1958, <u>c.</u>143 (C.43:3B-1
> et seq.), unless the adjustment is
> reactivated as permitted by law.  This
> provision shall not reduce the monthly
> retirement benefit that a retirant or a
> beneficiary is receiving on the effective
> date of <u>P.L.</u>2011, <u>c.</u>78 when the benefit
> includes an adjustment granted prior to that
> effective date.

[<u>N.J.S.A.</u> 43:3B-2(a).]

Under Chapter 78, the newly-created pension committees, which are comprised of both labor and state appointees, have the discretionary authority to reactivate COLAs when the individual

pension funds attain the "targeted funded ratio," that is, seventy-five percent funding in "State fiscal year 2012, and increased in each fiscal year thereafter by equal increments for seven years, until the ratio reaches 80 percent at which it shall remain for all subsequent fiscal years." N.J.S.A. 43:3C-16. See N.J.S.A. 43:15A-17 (PERS pension committee); N.J.S.A. 43:16A-13 (PFRS pension committee); N.J.S.A. 18A:66-56 (TPAF pension committee). The Sponsor's Statement explained:

> The committees of these systems will have the authority to reactivate the cost of living adjustment on pensions and modify the basis for the calculation of the cost of living adjustment and set the duration and extent of the activation. A committee must give priority consideration to the reactivation of the cost of living adjustment.
>
> . . . .
>
> Under the bill, the automatic cost-of-living adjustment will no longer be provided to current and future retirees and beneficiaries, unless it is reactivated as permitted by the bill.
>
> [Sponsor's Statement to Senate Bill No. 2937, at 119-20 (June 13, 2011).]

The Division of Pensions and Benefits estimated that the

> total State savings attributable to the changes to employee contributions for pensions and health care and to pension benefit and actuarial changes, such as elimination of the retiree COLA for the State-administered retirement systems, will be $45,689,111 in FY 2012, $114,768,000 in

FY 2013, and $203,442,676 in FY 2014. The fiscal impact in FY 2012 resulting from the pension reform changes are estimates and are subject to change.

[Fiscal Note to Senate, No. 2937, 214th Leg. (N.J. June 28, 2011).]

In a press release accompanying the bill, the Governor stated that "pension funds are considered to be adequately funded if their AVA funded ratio is at or above 80% (the federal standard for "at-risk" funds). At the end of fiscal 2010, the State's plans' combined AVA funded level was just 56 percent." Governor's Statement upon Signing Senate Bill No. 2937, L. 2011, c. 78 (June 28, 2011).

These reforms protect the pension system for retirees, increasing the funded ratio of the combined state and local systems from the current 62% to more than 88% over the next thirty years. By 2041, this will reduce total pension underfunding to $37 billion. Without these critical reforms, the unfunded liability across the pension systems would have skyrocketed to $183 billion, resulting in a massive impact on state and local budgets.

[Ibid.]

As part of the political compromise that produced its passage, Chapter 78 also amended the non-forfeitable right statute to provide that members of the State-administered pension systems have a contractual right to the annual required contribution made by the employer or any other public entity.

L. 2011, c. 78, § 26, codified at N.J.S.A. 43:3C-9.5(c)(2).  The statute was also amended to provide that any rights reserved to the State under N.J.S.A. 43:3C-9.5(e) to modify or amend the retirement systems "shall not diminish the contractual rights of employees established by subsections a, b, and c of this section."  Ibid.  (emphasis added).

N.J.S.A. 43:3C-9.5 (emphasis added), currently provides:

> a. For purposes of this section, a "non-forfeitable right to receive benefits" means that the benefits program, for any employee for whom the right has attached, cannot be reduced.  The provisions of this section shall not apply to post-retirement medical benefits which are provided pursuant to law.
>
> b. Vested members . . . shall have a non-forfeitable right to receive benefits as provided under the laws governing the retirement system or fund upon the attainment of five years of service credit in the retirement system or fund or on the effective date of this act, whichever is later. This subsection shall not be applicable to a person who becomes a member of these systems or funds on or after the effective date [May 21, 2010] of P.L.2010, c.1 . . . .
>
> c.  (1) The State and all other applicable employers shall make their annual normal contribution to each system or fund as determined by the applicable board of trustees in consultation with the system's or fund's actuary . . . .
>
> (2) Each member of [PERS, PFRS, TPAF, and other retirement systems] . . . shall have a contractual right to the annual required contribution amount being made by

the member's employer or by any other public entity. The contractual right to the annual required contribution means that the employer or other public entity shall make the annual required contribution on a timely basis to help ensure that the retirement system is securely funded and that the retirement benefits to which the members are entitled by statute and in consideration for their public service and in compensation for their work will be paid upon retirement. The failure of the State or any other public employer to make the annually required contribution shall be deemed to be an impairment of the contractual right of each employee. The Superior Court, Law Division shall have jurisdiction over any action brought by a member of any system or fund or any board of trustees to enforce the contractual right set forth in this subsection. The State and other public employers shall submit to the jurisdiction of the Superior Court . . . and shall not assert sovereign immunity in such an action. If a member or board prevails in litigation to enforce the contractual right set forth in this subsection, the court may award that party their reasonable attorney's fees.

d. This act shall not be construed to preclude forfeiture, suspension or reduction in benefits for dishonorable service.

e. Except as expressly provided herein and only to the extent so expressly provided, nothing in this act shall be deemed to (1) limit the right of the State to alter, modify or amend such retirement systems and funds, or (2) create in any member a right in the corpus or management of a retirement system or pension fund. The rights reserved to the State in this subsection shall not diminish the contractual rights of employees established by subsections a., b., and c. of this section.

In their complaint, the Berg intervenors asserted that from 2006 to 2011 the unfunded liability of the retirement systems increased as follows: PERS increased from $2.6 billion to an estimated $15.6 billion; TPAF increased from $5.8 billion to $31.2 billion; and PFRS increased from $3.5 billion to $11 billion. During that same period the funding ratios decreased. The State does not contest those allegations, which are consistent with the actuarial reports in the record. Intervenors allege that the increase in unfunded liabilities and the decrease in funded ratios of the TPAF, PERS and PFRS are attributable in significant part to the reduced contributions from the State and local employers.

In the 2014 budget, the Legislature appropriated a $1.676 billion payment for the pension systems, consistent with the funding formula set forth in the 2010 pension amendments. N.J.S.A. 43:3C-14, L. 2010, c. 1, § 38. However, by Executive Order 156 (May 20, 2014), the Governor reduced the State's pension contribution by ordering the State Treasurer to freeze expenditures.[5] The Executive order was issued in response to what the Governor characterized as an $875 million shortfall in

_____

[5] The validity of the Executive Order is not before us, and our opinion is not intended to address that issue.

expected State tax revenues and a total revenue gap of approximately $1.3 billion.

PROCEDURAL HISTORY

On July 26, 2011, plaintiffs, Richard W. Berg and twenty-five other retired government attorneys (plaintiffs), filed a notice of claim in accordance with the statutory notice requirement of the Contractual Liability Act (CLA), N.J.S.A. 59:13-5, asserting that they had contractual, statutory, and constitutional rights to COLAs.

On December 2, 2011, plaintiffs filed a complaint, Berg v. Christie, MER-L-2996-11, against the Governor, the Secretary of State, the Director of the Division of Pensions (Director), the Board of Trustees of PERS, the State Treasurer, and the State (collectively defendants), challenging the constitutionality and enforceability of the suspension of their COLAs under Chapter 78. Plaintiffs alleged the suspension constituted a breach of express and implied contract (counts one and two), violated the Contract and Due Process Clauses of the Federal and State Constitutions (counts three, four, and six), and violated their state civil rights (count five). They sought a judgment declaring Chapter 78 unconstitutional, a permanent injunction, monetary damages, and attorneys' fees and costs.

On February 2, 2012, defendants filed a Rule 4:6-2(e) motion to dismiss for failure to state a claim upon which relief can be granted. Plaintiffs filed a cross-motion for summary judgment. Plaintiffs and defendants filed joint stipulations, including a stipulation that reports cited by defendants in their brief were admitted into evidence with the consent of the parties. As a result, the motion to dismiss was converted into a summary judgment motion. R. 4:6-2.

On April 16, 2012, intervenors, a group of state and local active and retired employees and the labor organizations that represented them, filed a motion on short notice to intervene, on the COLA issue only.[6] By order issued on May 2, 2012, the trial court granted the motion for intervention pursuant to Rule 4:33-2. On May 8, 2012, intervenors filed a complaint in intervention, asserting claims of violation of the Contract

---

[6] On April 11, 2012, intervenors filed a separate "declaratory judgment and class action" complaint in state court, New Jersey Education Association v. State of New Jersey, MER-L-0771-12, against the State, the Governor, and the State Treasurer, challenging several provisions of Chapter 78, including suspension of the COLAs. Assignment Judge Mary Jacobson stayed the proceedings in New Jersey Education Association, MER-L-0771-12, pending decision in Berg.
Previously, on November 17, 2011, intervenors had also filed a complaint in federal district court. N.J. Educ. Ass'n v. State, Civ. No. 11-5024 (D.N.J. March 5, 2012). On March 5, 2012, United States District Court Judge Anne Thompson dismissed the federal complaint on sovereign immunity grounds under the Eleventh Amendment to the United States Constitution.

Clause (count one), violation of Due Process (count two), and equitable estoppel.

On May 25, 2012, a Law Division judge conducted oral argument on the motions, and issued a brief oral decision granting defendants' motion for summary judgment. The judge found that the suspension of COLAs under Chapter 78 was constitutional because, under the Debt Limitation and Appropriations Clauses, the Legislature retained continuing authority to amend the pension systems. The judge did not decide plaintiffs' Contract Clause, and other claims.[7] On June 20, 2012, the judge issued an amended order dismissing plaintiffs' complaints.[8]

## II

On an appeal from a summary judgment order, our review is de novo, and we owe no deference to the trial court's legal interpretations. See Perez v. Professionally Green, LLC, 215

---

[7] Nor did the judge at any point certify the case as a class action. In fact, the plaintiffs in Berg emphasize, in their reply brief, that theirs is not a class action.

[8] On August 24, 2012, intervenors filed an amended complaint in New Jersey Education Ass'n, MER-L-771-12, deleting their COLA claims, class allegations, and damages claims. In October 2012, defendants filed a motion to dismiss in that case. On February 21, 2013, Judge Jacobson issued a well-reasoned decision granting defendants' motion to dismiss intervenors' amended complaint.

N.J. 388, 398-99 (2013). We agree with the Berg plaintiffs[9] that the trial court erred in premising its decision on the Debt Limitation and Appropriations Clauses of the New Jersey Constitution. The Appropriations Clause, N.J. Const. art. VIII, § 2, ¶ 2, requires "that the State's finances be conducted on the basis of a single fiscal year covered by a single balanced budget." N.J. Educ. Ass'n, supra, 412 N.J. Super. at 216. The clause generally bars the courts from ordering the Legislature to appropriate funds. City of Camden v. Byrne, 82 N.J. 133, 149 (1980). The Debt Limitation Clause, N.J. Const. art. VIII, § 2, ¶ 3, prohibits "'one Legislature from incurring debts which subsequent Legislatures would be obliged to pay, without prior approval by public referendum.'" City of Camden, supra, 82 N.J. at 152 (citation omitted).

There is no dispute that, at the current time, there are sufficient funds in the pension systems to pay COLAs to current retirees. Moreover, pensions are neither funded by appropriations on a pay-as-you-go basis, in the way that COLAs used to be, nor is their payment contingent on the making of a current appropriation. Compare N.J.S.A. 43:3B-4.1 with N.J.S.A. 43:3B-4a. During the years that the State skipped making its

_____

[9] We refer to the original plaintiffs and the intervenors, collectively, as "the Berg plaintiffs."

pension contributions, the pension systems continued paying COLAs to retirees. In fact, in 2010, the State assured this court that the pension systems were capable of paying out benefits for the next thirty years, despite the State's failure to make its contributions to the funds. N.J. Educ. Ass'n, supra, 412 N.J. Super. at 215 n.14. Hence, COLAs can be paid currently without the need for any legislative appropriation. Consequently, neither the Appropriations Clause nor the Debt Limitations Clause is currently implicated here, where the issue is payment to retirees from the pension funds rather than payment by the Legislature into the funds. See City of Camden, supra, 82 N.J. at 148-53; N.J. Educ. Ass'n, supra, 412 N.J. Super. at 215 (noting the "clear distinction between the right to receive pension benefits and the funding method adopted by the Legislature to assure that monies are available for the payment of such benefits.")

It may be argued that if the pension funds are not restored to fiscal health, at some point the money will run out and an appropriation will be needed to restore the funds' solvency. A lawsuit aimed at requiring such an appropriation would implicate both the Appropriations Clause and the Debt Limitation Clause. See N.J. Educ. Ass'n, supra, 412 N.J. Super. at 216. However, we conclude that in this lawsuit, such a potential eventuality

does not trigger either clause. See Passaic, supra, 18 N.J. at 147 (finding no violation of the Debt Limitation Clause in the creation of a pension fund to which State law provides the State "shall" contribute); Enourato v. N.J. Bldg. Auth., 90 N.J. 396, 402-03, 410 (1982) (holding that contracts subject to legislative appropriation do not violate the Debt Limitation Clause, but recognizing that the State's failure to honor its financial commitments may affect its bond rating).

Nor can we agree with the trial court's conclusion that N.J.S.A. 43:3C-9.5(e) defeats plaintiffs' contract claim. Subsection (e) reserves to the Legislature the "right to alter, modify or amend" the retirement systems, "[e]xcept as expressly provided herein . . . ." Ibid. (emphasis added). Reading section 9.5 as a whole, the emphasized phrase clearly refers to the rights created in sections 9.5(a) and (b), which are exceptions to the reserved right to alter, modify or amend the retirement systems. Thus, section 9.5 gives retired or vested members a non-forfeitable right to their pension benefits as described in subsections (a) and (b), while subsection (e) allows the State to modify the pension systems as to employees or retirees to whom subsection (b) does not apply.

We have considered the additional contentions raised by the Berg plaintiffs, and we conclude that, to a large extent, they

are recycling arguments that were litigated and decided adversely to the intervenor-plaintiffs in the prior state and federal lawsuits noted in section I of this opinion. Those arguments were properly addressed and rejected by Judge Mary Jacobson, New Jersey Education Association v. State, No. L-0771-12 (Law Div. June 13, 2013), and Judge Anne Thompson, New Jersey Education Association v. State, Civ. No. 11-5024 (D.N.J. March 5, 2012). With respect to the State's Eleventh Amendment immunity, we add that the State may not "be forced to entertain in its own courts suits from which it was immune in federal court . . . ." Howlett v. Rose, 496 U.S. 356, 365, 110 S. Ct. 2430, 2437, 110 L. Ed. 2d 332, 346 (1990); see also Alden v. Maine, 527 U.S. 706, 748, 119 S. Ct. 2240, 2263, 144 L. Ed. 2d 636, 673-74 (1999). Because the State has sovereign immunity with respect to plaintiffs' federal causes of action, plaintiffs' federal Contract Clause claims were properly dismissed.[10] See Allen v. Fauver, 167 N.J. 69, 75 (2001). With the exception of their State Contract Clause claims (discussed

---

[10] As discussed later in this opinion, because the Contract Clauses in the State and Federal Constitutions are construed the same way, dismissal of the federal claim has no impact on the legal analysis of plaintiffs' state Contract Clause cause of action. See Fid. Union Trust Co. v. N.J. Highway Auth., 85 N.J. 277, 299 (1981) (discussing parallel construction of Federal and State Contract Clause).

in section III, infra), the Berg plaintiffs' arguments are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Turning to the DeLucia case, plaintiffs are former law enforcement officers who were wounded in the line of duty and retired on disability pensions paid by the Police and Firemen's Retirement System (PFRS)[11] In an effort to differentiate themselves from the Berg plaintiffs, they filed a separate lawsuit, raising claims based on the Victims' Rights Amendment, N.J. Const. art. I, ¶ 22; the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38; and the tax-exemption and non-assignability provision of the PFRS statute, N.J.S.A. 43:16A-17. In an oral opinion issued on August 24, 2012, the trial court dismissed their complaint.

While we are not unsympathetic to the DeLucia plaintiffs and the sacrifices they made during their law enforcement careers, the statutory and constitutional provisions they cite are irrelevant to the issue of their entitlement to a pension or a COLA. Without relying on N.J.S.A. 43:3C-9.5, these plaintiffs also argue more generally that a COLA represents deferred compensation which the State cannot deny them. These and related arguments were properly rejected by the trial court.

_____

[11] The former officers' wives are co-plaintiffs.

Plaintiffs' appellate arguments do not merit further discussion here.  R. 2:11-3(e)(1)(E).[12]

Hence, we turn to the contract issue.

III

A.  The Existence of a Contractual Right

Plaintiffs claim that the following language gives vested or retired employees a contractual right to receive not only basic pension benefits but COLAs:

> a. For purposes of this section, a "non-forfeitable right to receive benefits" means that the benefits program, for any employee for whom the right has attached, cannot be reduced.  The provisions of this section shall not apply to post-retirement medical benefits which are provided pursuant to law.
>
> b. Vested members of [PERS, PFRS, TPAF, and other retirement systems], upon the attainment of five years of service credit in the retirement system or fund or on the date of enactment of this bill, whichever is later, shall have a non-forfeitable right to receive benefits as provided under the laws governing the retirement system or fund upon the attainment of five years of service credit in the retirement system or fund or on the effective date of this act, whichever is later.
>
> [N.J.S.A. 43:3C-9.5(a) and (b).]

---

[12]  We reach the same conclusion with respect to the separate argument raised by pro se plaintiff Ouslander in the Berg case. He seeks to differentiate himself from the remaining plaintiffs, by claiming promissory estoppel based on having taken early retirement.  That argument is likewise unconvincing and warrants no further discussion here.  R. 2:11-3(e)(1)(E).

We begin with some basic principles of statutory interpretation. In construing any legislation, we attempt to determine and effectuate the intent of the Legislature. Allen v. V & A Bros., Inc., 208 N.J. 114, 127 (2011). We first consider the statute's plain language, but "[w]hen 'the Legislature's intent cannot be derived from the words that it has chosen[,]' a court may use extrinsic tools such as legislative history, legal commentary, sponsors' statements, or a Governor's press release." Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 108 (2010) (citations omitted). Indeed, "[s]tatutes cannot be read in a vacuum void of relevant historical and policy considerations and related legislation." Borough of Matawan v. Monmouth Cnty. Bd. of Taxation, 51 N.J. 291, 299 (1968).

Because pension legislation is remedial in nature, it should generally be liberally construed in favor of the employee. Klumb v. Bd. of Educ. of the Manalapan-Englishtown Reg'l High Sch. Dist., 199 N.J. 14, 34 (2009). However, in this case, the principle is in tension with the general rule that statutes are not to be construed as creating contracts.

Because the primary role of the Legislature is to enact statutes, not to create contracts, our courts are generally reluctant to imply a contract created by legislation. N.J.

Educ. Ass'n, 412 N.J. Super. at 206.  That reluctance extends to the State's pension funds.  The concept was explored at length in Spina, supra, 41 N.J. at 403-04, which involved a pension crisis arising from a combination of overly generous benefits and inadequate funding.  In upholding the Legislature's power to increase the retirement age and years-of-service requirement, the Court declined to characterize the pension right as contractual.[13]

> In these circumstances, it seems idle to sum up either the public's or the employee's contribution in one crisp word. We have no doubt that pension benefits are not a gratuity within the constitutional ban against the donation of public moneys. . . . And we think the employee has a property interest in an existing fund which the State could not simply confiscate.  Whether the interest thus secured from arbitrary action is limited to the employee's own contribution or extends to the entire fund and whether it becomes still more secure upon retirement, we need not say. . . .  <u>The usual situation, as in the case before us, is a fund that cannot meet all of the present and future demands upon it.  And the question is whether the Legislature is free to rewrite the formula for the good of all who have contributed.</u>
>
> [Spina, supra, 41 N.J. at 402 (citations omitted) (emphasis added).]

---

[13] The Court noted that during the 1947 Constitutional Convention, the drafters rejected language conferring on public employees a contractual right to pension benefits.  Id. at 400 n.3; see N.J. Educ. Ass'n, supra, 412 N.J. Super. at 294-95.

The Court further observed that the contract approach to pension benefits was likely to hamper the Legislature's ability to deal with funding crises affecting the pension fund:

> The difficulty with the contract approach is that it cannot withstand the pressures upon it.
>
> If the contractual obligation of the public employer is really to equal the expectations of all of the rank-and-file members, it must include a guaranty by the employer of the solvency of the fund. . . .
>
> . . . .
>
> Moreover, even as to the disposition of the fund itself, the contract concept is cumbersome. What happens if the plan is unsound, so that little or nothing will remain for those presently contributing? . . . As a practical matter, legislative intervention is the only sensible approach. . . . True the needed power in the Legislature to revise a plan without the consent of the parties to the "contract" could be said to be "implied," but it seems odd to say the State may unilaterally rewrite its own contract . . . . We think it more accurate to acknowledge the inadequacy of the contractual concept.
>
> [Id. at 403-04.]

Mindful of our required hesitancy to infer legislative contracts, and the practical difficulties the Court described in Spina, we nonetheless find that the non-forfeitable rights statute enacted in 1997 created a contractual right. Based on our review of the legislative history of the Act, we conclude

41

that the creation of a contractual right to pension benefits stemmed from concerns raised by public employee unions after the State, through 1994 legislation, re-valued pension fund assets, L. 1994, c. 62, and later skipped making contributions to the pension funds.

During a May 20, 1996 legislative hearing on the State's public pension systems, then-State Treasurer Bryan Clymer insisted that the pension systems were fiscally sound, despite concerns expressed by public employee unions. Public Hearing Before Senate State Management, Investment and Financial Institutions Committee (May 20, 1996) (Pension Hearing). He stated:

> Public employee and teacher unions opposed pension reform, and are now suing me personally in Federal court in an attempt to overturn the reform. Their argument is that we are underfunding the retirement systems and, in the near future, contributions will rise dramatically. This, they claim, will result in voter and taxpayer outcry for a reduction in pension benefits.
>
> [Pension Hearing at 3-4.]

In response, a union representative challenged Clymer to support S-1132, a recently-introduced bill that would guarantee public employees a contractual right to their pension benefits:

> We believe that S-1132 achieves the level of security that most public employees are entitled to and that Treasurer Clymer maintains they have. If the pension funds

> are as secure as the Treasurer and his actuary maintain, he should have no problem signing off on S-1132. This bill simply affirms that vested members of the various public retirement systems have a contractual property right to a secure and financially sound retirement system and the benefits provided by that system.
>
> [Pension Hearing at 53.]

The hearing was chaired by Senator Peter Inverso,[14] the principal sponsor of S-1119, which was eventually adopted as the 1997 non-forfeiture legislation. Senator Inverso introduced S-1119 on May 9, 1996, two weeks before the hearing. Unlike S-1132, the bill the unions supported, S-1119 originally did not contain a contractual rights provision.

The original sponsor's statement, as well as the language of the original bill, made clear that its purpose was "to conform the administration of the [pension systems] to federal Internal Revenue Code requirements in order to maintain the qualified status of these retirement systems and pension funds." Sponsor's Statement to Senate Bill No. 1119, at 4 (May 9, 1996). The bill stemmed from an investigation by the Internal Revenue Service based on allegations that the State had illegally diverted pension funds to other uses. The lawsuit had been

---

[14] Senator Inverso noted during the hearing that he was a certified public accountant.

settled on March 21, 1996, with the State agreeing to restore the funds to the pension system.

During the May 20, 1996 hearing, a union-retained actuary explained the employees' concern that, as a result of skipping pension payments, the State would eventually find itself facing a need to make a much larger contribution in the future, would balk at such a large expenditure, and would instead try to cut benefits. The actuary urged, "it is critical that this Legislature guarantee the benefits that employees have earned" and argued that the Legislature should accomplish that goal by providing a contractual right to the benefits. Pension Hearing at 68-69.

Senator Inverso responded:

> I feel strongly that the same protections and rights that are accorded . . . under an ERISA [Employee Retirement Income Security Act] standard to people in the private sector, should be accorded to people in the public sector, the governmental sector; that once they have their pensions established as at a point in time with regard to vesting it, that you cannot go back retroactively and change what has been earned, what has been accrued, what has been vested in.
>
> [Pension Hearing at 69.]

Senator Inverso indicated that he was prepared to negotiate with the "administration" (presumably, the Executive Branch) on that point. Pension Hearing at 70.

On April 17, 1997, Senate Bill No. 1119, was amended by the Senate Budget and Appropriations Committee to add the non-forfeiture provision.[15] The Committee Statement to the bill reiterated its purpose to ensure that the pension systems conformed to Internal Revenue Code requirements. However, the Statement also recited that, with the exception of medical benefits, the bill amendments

> [p]rovide a vested member of a system or fund listed in the bill with a non-forfeitable right to receive benefits as provided under the laws governing the retirement system or fund in effect on the date of attainment of five years of service credit in the system or fund by the member.
>
> [Committee's Statement to Senate Bill No. 1119, at 2 (April 17, 1997).]

Nothing in the Statement suggested that COLAs, as opposed to medical benefits, were to be excluded from the non-forfeitable rights provision. The Statement also noted that the bill required the State "to make annual normal contributions and annual unfunded accrued liability contributions to each retirement system or fund except under two circumstances set forth in the bill." Ibid.

---

[15] At that time, Senator Inverso was the Vice-Chair of the Committee. See APPROPRIATIONS HANDBOOK FY 1997-98, http://www.state.nj.us/treasury/omb/publications/98approp/pdf/asection.pdf (last visited June 12, 2014).

In a recent case, the State conceded that retirees have a contractual right to the basic pension benefit they began receiving upon retirement. N.J. Educ. Ass'n, supra, 412 N.J. Super. at 215. N.J. Educ. Ass'n involved a challenge by members of the Teachers' Pension and Annuity Fund to the State's method of funding the pension system. We affirmed the dismissal of the lawsuit, "finding that TPAF members, although entitled by law to the receipt of vested benefits upon retirement, possess no constitutionally-protected contract right to the particular level, manner or method of State funding provided in the statute." Id. at 196. Although the contractual right to vested benefits on retirement was not directly at issue in N.J. Educ. Ass'n, we recognized the "non-forfeitable rights" language of N.J.S.A. 43:3C-9.5:

> The general statutes recognize that vested members have "a non-forfeitable right to receive benefits," which they define as "mean[ing] that the benefits program, for any employee for whom the right has attached, cannot be reduced." N.J.S.A. 43:3C-9.5(a), (b). However, they also reserve the State's right to alter the "retirement systems and funds," and they deny that members have rights in the pension funds themselves . . . .
>
> [Id. at 200.]

We also acknowledged the State's concession that section 9.5 created contract rights:

The fact that plaintiffs have no constitutionally-protected vested contract right in systematic funding of TPAF does not mean that the pension statutes confer no rights at all. There is a clear distinction between the right to receive pension benefits and the funding method adopted by the Legislature to assure that monies are available for the payment of such benefits. As to the former, N.J.S.A. 43:3C-9.5(b) provides that members "shall have a non-forfeitable right to receive benefits as provided under the laws governing the retirement system or fund upon the attainment of five years of service credit in the retirement system or fund. . . ." (emphasis added). The "non-forfeitable right" means "that the benefits program, for any employee for whom the right has attached, cannot be reduced." N.J.S.A. 43:3C-9.5(a). The essence of the right, acknowledged by the Attorney General, is the receipt of promised funds upon retirement, presumably at the rate fixed by law when such benefits were conferred. Indeed, the Attorney General concedes that in granting a non-forfeitable right to receive benefits, "the Legislature intended to create enforceable contractual rights."

[Id. at 215 (first emphasis in original, second emphasis added) (footnote omitted).]

We noted that "[a]s to this non-forfeitable right" both parties agreed that TPAF would "continue to have enough assets [to pay pension benefits] for at least the next thirty years . . . ." Id. at 215 n.14. Hence, there had been "no impairment — much less a substantial one — of plaintiffs' non-forfeitable right to receive accrued pension benefits." Ibid. We concluded, however, that one Legislature could not bind a future

Legislature to make an appropriation for the pension fund, without running afoul of the Appropriations Clause. Id. at 216.

In N.J. Educ. Ass'n, the State's position on the contract question was consistent with opinions previously issued by the Office of the Attorney General and the Office of Legislative Services. As previously discussed, both opinions advised that N.J.S.A. 43:3B-9.5 created a contractual right to pension benefits, and hence the State could not diminish vested pension benefits unless it could satisfy the constitutional standards under which the State may impair the obligation of a contract.

Based on the foregoing, we begin from the premise that the "non-forfeitable rights" clause created a contractual right to receive, upon retirement, pension benefits at the rates in effect at the time the employee attained five years of service or at the time the non-forfeitable rights statute was passed, whichever was later. The issue in this case is whether, in enacting the non-forfeitable rights clause, the Legislature intended that cost of living increases be included in that contractual right.

The State argues that because COLAs are controlled by the Pension Adjustment Act, while each individual pension system or retirement plan is governed by its own separate legislation, the term "benefits" in the non-forfeitable rights clause should be

interpreted as applying only to the benefits provided by each separate pension/retirement system and not to COLAs.

The history of the pension statutes, including amendments to the Pension Adjustment Act, convinces us that COLAs are such an integral part of the pension system that the Legislature must have intended that they be included as part of the non-forfeitable right, N.J.S.A. 43:3C-9.5, guaranteed in 1997. As previously discussed, while COLAs were originally funded by annual appropriations, and could be denied if the Legislature failed to make an appropriation, N.J.S.A. 43:3B-5, that system was abandoned decades ago.

Instead, through amendments adopted in the late 1980's and early 1990's, COLAs are funded in the same way that the regular pension benefits are funded, and COLAs are payable from each of the applicable pension funds. See N.J.S.A. 43:16A-15.6 (L. 1989, c. 204, § 7); N.J.S.A. 43:16A-15.7 (L. 1991, c. 511, § 3); N.J.S.A. 43:15A-24.1 (L. 1990, c. 6, § 2). As plaintiff Ouslander points out, the Committee's Statement to Senate Bill No. 665, which was eventually codified at N.J.S.A. 43:15A-24.1, explains that the bill "provides that the COLA payment would be recognized as a liability of the system in the same manner as other retirement benefits are now liabilities." Committee's Statement to Senate Bill No. 665, at 1 (Feb. 5, 1990). Hence,

we reject the State's argument that the reference, in section 9.5(b), to a retiree's non-forfeitable entitlement "to receive benefits as provided under the laws governing the retirement system or fund" refers only to benefits under the basic pension funds and not to COLAs.[16]  We conclude that the laws governing COLAs are part of the laws governing the retirement systems or funds.

The State also contends that when the non-forfeitable rights statute, N.J.S.A. 43:3C-9.5, was enacted, the Pension Adjustment Act, N.J.S.A. 43:3B-2, explicitly provided that COLAs could be decreased, revoked, or repealed "as otherwise provided in this act."  Consequently, the State argues, the Legislature would not logically have intended to include COLAs in the non-

---

[16]  Plaintiffs argue that, in other contexts, including the valuation of assets during a divorce, and calculation of a disability-retired police officer's compensation for purposes of N.J.S.A. 40A:14-154, courts have recognized COLAs as an integral part of a retiree's pension.  See Hayden v. Hayden, 284 N.J. Super. 418, 423 (App. Div. 1995); Brown, supra, 319 N.J. Super. at 511-12.  The State relies on another matrimonial case, Moore v. Moore, 114 N.J. 147, 163 (1989), for the proposition that COLAs are "contingent on state appropriation."  The argument is unpersuasive.  The quoted language referred to an expert report written in 1982, id. at 152, when COLAs were still funded on a pay-as-you-go basis.  Further, Moore was decided on February 15, 1989.  The PFRS statute, the source of the husband's pension in that case, was amended on December 20, 1989, to provide that COLAs were to be funded and paid for in the same manner as regular pension benefits.  See N.J.S.A. 43:16A-15.6; L. 1989 c. 204, § 7.

forfeitable rights provision because, as defined in section 2 of the Pension Adjustment Act, COLAs were always subject to change by amendment to the Adjustment Act, and the Legislature should not be deemed to have repealed section 2 by implication. The State thus argues that the non-forfeitable rights in <u>N.J.S.A.</u> 43:3C-9.5 cannot be read to impliedly repeal <u>N.J.S.A.</u> 43:3B-2, and the State remained free to change future COLA rates by amending the Pension Adjustment Act.

We conclude this argument is based on a misreading of subsection 3B-2, which reads in pertinent part:

> The monthly retirement allowance or pension originally granted to any retirant . . . shall be adjusted in accordance with the provisions of this act provided, however, that:
>
> . . . .
>
> Pension adjustments shall not be paid to retirants or beneficiaries who are not receiving their regular, full, monthly retirement allowances, pensions or survivorship benefits. <u>The adjustment granted under the provisions of this act shall be effective only on the first day of a month, shall be paid in monthly installments, and shall not be decreased, increased, revoked or repealed except as otherwise provided in this act.</u> No adjustment shall be due to a retirant or a beneficiary unless it constitutes a payment for an entire month; provided, however, that an adjustment shall be payable for the entire month in which the retirant or beneficiary dies.

[N.J.S.A. 43:3B-2 (emphasis added).]

We read the highlighted language, on which the State relies, as language of limitation.  Specifically, the language limits changes in previously-granted COLAs to those specific situations allowed by the Pension Adjustment Act.  For example, N.J.S.A. 43:3B-3 sets forth the formula for calculating COLAs each year.  Other provisions address the voluntary waiver of a right to increased retirement allowances, N.J.S.A. 43:3B-6, the cessation of payments if monies are not appropriated, N.J.S.A. 43:3B-5,[17] and the termination of COLA benefits if the Legislature provides for a "blanket increase in original retirement allowances."  N.J.S.A. 43:3B-8.  In context, we read section 2 as limiting the extent to which a COLA that was already awarded could be reduced, increased or revoked.  Nothing in its language suggests that the Legislature could not, in separate legislation, contractually guarantee the right to receive a COLA.  Hence, N.J.S.A. 43:3B-2 and N.J.S.A. 43:3C-9.5 are compatible and, contrary to the State's argument, the latter does not implicitly "repeal" the former.

During the 1996 Pension Hearing, the participants discussed the basic pension benefits and COLAs as part of the same system.

---

[17] This section was rendered obsolete when the pension statutes were amended to provide for pre-funding of COLAs instead of funding on a pay-as-you-go basis through annual appropriations.

See, e.g., Pension Hearing at 55.  Clearly the Legislature was well aware that COLAs were part of the various pension benefit plans.  In fact, in discussing the various actuarial assumptions, Robert Baus, the State's actuarial consultant, observed that the inclusion of COLAs as a pre-funded part of the pension system, instead of as a separate pay-as-you-go item, was a critical issue:  "The methodology is not driving the funding of this system.  What is driving the funding of this system is the phasing in of the COLA.  That is where the sensitivity of the cost is going to come in."  Pension Hearing at 2, 77.

Moreover, in section 9.5(a), the Legislature specifically excepted health benefits from the non-forfeitable right it created.  Given the historical context in which the section was enacted, we conclude that if the Legislature also intended to except COLAs, it would have specifically so stated.  In construing a statutory provision that contains a specific exception, "'doubts should be resolved in favor of the general provision rather than the exceptions.'"  Prado v. State, 186 N.J. 413, 426-27 (2006) (citation omitted).

The approach taken in the non-forfeitable rights statute enacted in 1997, was also consistent with ERISA, which has been construed as including COLAs, but not health benefits, as part of the accrued benefit to which an employee is entitled on

retirement and which cannot, absent very limited circumstances, be decreased after the employee retires.    See 29 U.S.C.A. § 1054(g)(1); Williams v. Rohm & Haas Pension Plan, 497 F.3d 710, 713 (7th Cir. 2007), cert. denied, 552 U.S. 1276 (2008).[18]   "'In contrast [to health benefits] the COLA [is] inseparably tied to the monthly retirement benefit as a means for maintaining the real value of that benefit.   It [cannot], therefore, be said to be ancillary to the benefit . . . .'"   Williams, supra, 497 F.3d at 713 (citation omitted, second and third alterations in original).

For all of these reasons, we conclude that the non-forfeitable right provision, which creates a contractual right to receive pension benefits, applies to COLAs.   In the next section, we address the constitutional implications of that conclusion.[19]

---

[18]   That approach may also have reflected Senator Inverso's observation, at the Pension Hearing, that the right to public pension benefits should be protected in the way private pension benefits are protected under ERISA.   See Pension Hearing at 69.

[19] We have intentionally refrained from addressing the scope of the class entitled to protection under section 9.5.    As previously noted, a class has not been certified in this case, and the record contains minimal information about the individual plaintiffs.   Those employed between 1997 and 2010 gave the State the benefit of their labor in exchange for the contractual protection section 9.5 provided, and those who retired during that time presumably did so in reliance on having contractually-guaranteed COLA benefits in retirement.   The parties have not
(continued)

B. <u>The State and Federal Contract Clauses</u>

As we recently recognized, while the State and Federal Constitutions protect legislative impairment of the obligations of contracts, that protection is not absolute:

> The Federal and State Constitutions prohibit the passage of any "law impairing the obligation of contracts." <u>U.S. Const.</u> art. I, § 10, cl. 1; <u>N.J. Const.</u> art. IV, § 7, ¶ 3. "The two clauses are applied coextensively and provide the same protection." <u>N.J. Educ. Ass'n v. State</u>, 412 <u>N.J. Super.</u> 192, 205 (App. Div.) (citation and internal quotation marks omitted), <u>certif. denied</u>, 202 <u>N.J.</u> 347 (2010). In addressing a claim for violation of the Contract Clause, the threshold inquiry is whether the law "operated as a substantial impairment of a contractual relationship." <u>Allied Structural Steel Co. v. Spannaus</u>, 438 <u>U.S.</u> 234, 244, 98 <u>S. Ct.</u> 2716, 2722, 57 <u>L. Ed.</u> 2d 727, 736 (1978). In making that determination courts inquire whether: 1) "there is a contractual relationship"; 2) the "change in law impairs that contractual relationship"; and 3) "the impairment is substantial." <u>Gen. Motors Corp. v. Romein</u>, 503 <u>U.S.</u> 181, 186, 112 <u>S. Ct.</u> 1105, 1109, 117 <u>L. Ed</u>. 2d 328, 337 (1992). If the state law constitutes a substantial impairment, it may nonetheless "be constitutional if it is reasonable and necessary to serve an important public purpose." <u>U.S. Trust Co. v. New Jersey</u>, 431 <u>U.S.</u> 1, 25, 97 <u>S. Ct.</u> 1505, 1519, 52 <u>L. Ed.</u> 2d 92, 112 (1977).

---

(continued)
briefed, and we have not addressed, whether the necessary elements for the formation of a contract exist with respect to employees who retired before section 9.5 was enacted, and who had since July 1, 1970, been receiving COLAs. <u>L.</u> 1969, <u>c.</u> 169. That issue may be raised on remand.

[Teamsters Local 97, supra, 434 N.J. Super.
at 425.]

See also Farmers Mut. Fire Ins. Co. v. N.J. Prop. Liab. Ins.
Guar. Ass'n, 215 N.J. 522, 546 (2013).

As we also stated in Teamsters Local 97, supra, 434 N.J.
Super. at 402-03,

> the money that funds employee benefits is
> not unlimited.  The State's officials are
> charged with the profound responsibility not
> only of ensuring that the health care and
> pension systems remain fiscally sound, but
> also that the State remains fiscally strong
> and that the burden on the State's taxpayers
> does not become intolerable.

However, consistent with constitutional principles and
common sense, we cannot blindly defer to the State's own
evaluation of a law's reasonableness and necessity, lest
political expediency replace objective fiscal evaluation:

> The Contract Clause is not an absolute bar
> to subsequent modification of a State's own
> financial obligations.  As with laws
> impairing the obligations of private
> contracts, an impairment may be
> constitutional if it is reasonable and
> necessary to serve an important public
> purpose.  In applying this standard,
> however, complete deference to a legislative
> assessment of reasonableness and necessity
> is not appropriate because the State's self-
> interest is at stake. A governmental entity
> can always find a use for extra money,
> especially when taxes do not have to be
> raised.  If a State could reduce its
> financial obligations whenever it wanted to
> spend the money for what it regarded as an

important public purpose, the Contract Clause would provide no protection at all.

[U.S. Trust Co., supra, 431 U.S. at 25-26, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112 (footnote omitted).]

Further, in enacting a law that impairs contractual rights, "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." Id. at 31, 97 S. Ct. at 1522, 52 L. Ed. 2d at 115.

As noted earlier, in evaluating a Contract Clause claim, a court must consider whether the challenged legislation "(1) 'substantially impair[s] a contractual relationship,' (2) 'lack[s] a significant and legitimate public purpose,' and (3) is 'based upon unreasonable conditions and . . . unrelated to appropriate governmental objectives.'" Farmers Mut. Fire Ins., supra, 215 N.J. at 546 (citations omitted).

In this case, the State argues that the pension system was, and still is, in financial difficulty that must be addressed lest the system eventually collapse. Our Supreme Court has acknowledged "the serious fiscal issues that confront the State and that led to the passage of Chapter 78." DePascale v. State, 211 N.J. 40, 63 (2012). Moreover, the fiscal health of the pension system is of importance to both current and future retirees. Although, even without a current legislative appropriation, there is now money in the pension funds from

A-5973-11T4

which to pay COLAs, unless there is a long-term financial solution, the money in the pension funds may eventually run out.

In another context, the Court has interpreted <u>Spina</u> as endorsing the State's authority to modify pension benefits when needed to ensure the integrity of the pension fund. In disagreeing with a County's interpretation of a statute mandating uniform benefits for all employees, the Court stated:

> While it has been held, moreover, that pension benefits can be modified in the interest of assuring the integrity of the pension system despite the compensatory aspect of their nature, it seems clear that they cannot be rescinded unilaterally when the underlying motivation is not preservation of the integrity of the benefit system but the erroneous belief that the benefits must be discontinued.
>
> [<u>Gauer v. Essex Cnty. Div. of Welfare</u>, 108 <u>N.J.</u> 140, 150 (1987) (citing <u>Spina</u>, <u>supra</u>, 41 <u>N.J.</u> at 402).]

It may be argued that the Chapter 78 legislation was part of a reasonable, tripartite approach to the pension-funding problem, which required some contribution from all the stakeholders — additional pension contributions from current employees, the resumption of normal pension contributions by the State with additional contributions to pay down the shortfall, and the temporary cessation of COLAs for retirees. <u>See</u> <u>L.</u> 2010, <u>c.</u> 1 § 38; <u>L.</u> 2011, <u>c.</u> 78, §§ 8, 10, 15, 25. It may further be argued that in temporarily suspending COLAs, the Legislature

chose a "moderate course" rather than the more drastic step of reducing the basic pension benefit for retirees. See U.S. Trust Co., supra, 431 U.S. at 31, 97 S. Ct. at 1522, 52 L. Ed. 2d at 115.

On the other hand, plaintiffs contend that the State was partially responsible for the pension shortfall by skipping its pension contributions in prior years, and it should not be permitted to thus precipitate a pension crisis and then solve it at the expense of retirees. Plaintiffs also argue that the State has taken contradictory positions about the health of the pension systems, assuring this court in N.J. Educ. Ass'n that the systems were sound enough to meet their obligations for the next thirty years despite the State's failure to make its contributions, and now telling us that "the pension system is teetering on the brink of collapse." See testimony of Senator Sweeney (a sponsor of Senate Bill No. 2937) before the Senate Budget and Appropriations Committee on June 16, 2011.

In a recent submission, plaintiffs further point out that the State is proposing to renege on its promised contributions, through an Executive Order suspending a portion of the State's planned pension payments for this fiscal year and the next. See Executive Order 156 (May 20, 2014). Of course, in response, the State would no doubt contend that there were other reasons for

the pension shortfall, including drastic investment losses caused by the financial "meltdown" in the stock market, and that it intends to make as large a contribution as it can in the current and coming fiscal years, consistent with avoiding another general budget crisis.

As noted below, on this record, we cannot determine which side has the better arguments.[20] Further, even if we were to currently view the suspension of COLAs as a moderate and reasonable step, that view might change in the future, depending on how long the suspension lasts, how quickly the cost of living increases, and whether, and to what extent, the State meets its own obligations under the tripartite approach it created.

While we note these issues, we agree with intervenor-plaintiffs and defendants, who both argue that, if we find section 9.5 created contractual rights, we cannot fairly decide the constitutional impairment-of-contract claim on this record. Because the trial court did not address the contract clause issue at all, and because a contract-impairment claim presents

---

[20] The summary judgment record the parties created was extremely limited, consisting of a few factual stipulations and an agreement that several actuarial reports and similar documents would be admitted in evidence. There were no expert depositions or other expert analysis of the evidence. By contrast, in N.J. Educ. Ass'n, the trial court held a four-day bench trial on the contract impairment issue. See N.J. Educ. Ass'n, supra, 412 N.J. Super. at 201.

"a mixed question of fact and law," N.J. Educ. Ass'n, supra, 412 N.J. Super. at 206 n.10, a remand is required to allow all sides to create a complete evidentiary record. Hence, we remand this case to the trial court for further proceedings consistent with this opinion. If there are additional arguments the parties wish to raise on remand concerning the impairment-of-contracts issue, they may do so.

In remanding, we end with these observations. It is not the courts' role to run the pension systems. Our responsibility is to interpret and apply the Constitution in light of the evidence, and we will do so. But to a very great extent, the strength of the pension systems rests on policy choices made by the other two branches of government, and on their political will to preserve the systems and satisfy prior commitments made to public employees and retirees. See Spina, supra, 41 N.J. at 404-05.

Affirmed in DeLucia (A-0632-12). Reversed and remanded in Berg (A-5973-11, 6002-11).

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION